(Slip Opinion)                OCTOBER  TERM,  2009                                1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HERTZ CORP. *v.* FRIEND ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 08–1107.   Argued November 10, 2009—Decided February 23, 2010

Respondents, California citizens, sued petitioner Hertz Corporation in a California state court for claimed state-law violations.  Hertz sought removal to the Federal District Court under 28 U. S. C. §§1332(d)(2), 1441(a), claiming that because it and respondents were citizens of different States, §§1332(a)(1), (c)(1), the federal court possessed diversity-of-citizenship jurisdiction.  Respondents, however, claimed that Hertz was a California citizen, like themselves, and that, hence, diversity jurisdiction was lacking under §1332(c)(1), which provides that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."  To show that its "principal place of business" was in New Jersey, not California, Hertz submitted a declaration stating, among other things, that it operated facilities in 44 States, that California accounted for only a portion of its business activity, that its leadership is at its corporate headquarters in New Jersey, and that its core executive and administrative functions are primarily carried out there.  The District Court concluded that it lacked diversity jurisdiction because Hertz was a California citizen under Ninth Circuit precedent, which asks, *inter alia,* whether the amount of the corporation's business activity is "significantly larger" or "substantially predominates" in one State.  Finding that California was Hertz's "principal place of business" under that test because a plurality of the relevant business activity occurred there, the District Court remanded the case to state court.  The Ninth Circuit affirmed.

*Held:*

   1. Respondents' argument that this Court lacks jurisdiction under §1453(c)—which expressly permits appeals of remand orders such as the District Court's only to "court[s] of appeals," not to the Supreme

Court, and provides that if "a final judgment on the appeal" in a court of appeals "is not issued before the end" of 60 days (with a possible 10-day extension), "the appeal shall be denied"—makes far too much of too little. The Court normally does not read statutory silence as implicitly modifying or limiting its jurisdiction that another statute specifically grants. *E.g., Felker* v. *Turpin*, 518 U. S. 651, 660–661. Here, replicating similar, older statutes, §1254 specifically gives the Court jurisdiction to "revie[w] . . . [b]y writ of certiorari" cases that are "in the courts of appeals" when it grants the writ. The Court thus interprets §1453(c)'s "60-day" requirement as simply requiring a court of appeals to reach a decision within a specified time—not to deprive this Court of subsequent jurisdiction to review the case. See*, e.g., Aetna Casualty & Surety Co.* v. *Flowers*, 330 U. S. 464, 466–467. Pp. 4–5.

   2. The phrase "principal place of business" in §1332(c)(1) refers to the place where a corporation's high level officers direct, control, and coordinate the corporation's activities, *i.e.,* its "nerve center," which will typically be found at its corporate headquarters. Pp. 5–19.

   (a) A brief review of the legislative history of diversity jurisdiction demonstrates that Congress added §1332(c)(1)'s "principal place of business" language to the traditional state-of-incorporation test in order to prevent corporations from manipulating federal-court jurisdiction as well as to reduce the number of diversity cases. Pp. 5–10.

   (b) However, the phrase "principal place of business" has proved more difficult to apply than its originators likely expected. After Congress' amendment, courts were uncertain as to where to look to determine a corporation's "principal place of business" for diversity purposes. If a corporation's headquarters and executive offices were in the same State in which it did most of its business, the test seemed straightforward. The "principal place of business" was in that State. But if those corporate headquarters, including executive offices, were in one State, while the corporation's plants or other centers of business activity were located in other States, the answer was less obvious. Under these circumstances, for corporations with "far-flung" business activities, numerous Circuits have looked to a corporation's "nerve center," from which the corporation radiates out to its constituent parts and from which its officers direct, control, and coordinate the corporation's activities. However, this test did not go far enough, for it did not answer what courts should do when a corporation's operations are not far-flung but rather limited to only a few States. When faced with this question, various courts have focused more heavily on where a corporation's actual business activities are located, adopting divergent and increasingly complex tests to interpret the statute. Pp. 10–13.

(c) In an effort to find a single, more uniform interpretation of the statutory phrase, this Court returns to the "nerve center" approach: "[P]rincipal place of business" is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. In practice it should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the "nerve center," and not simply an office where the corporation holds its board meetings. Pp. 13–19.

(i) Three sets of considerations, taken together, convince the Court that the "nerve center" approach, while imperfect, is superior to other possibilities. First, §1332(c)(1)'s language supports the approach. The statute's word "place" is singular, not plural. Its word "principal" requires that the main, prominent, or most important place be chosen. Cf., *e.g., Commissioner* v. *Soliman*, 506 U. S. 168, 174. And the fact that the word "place" follows the words "State where" means that the "place" is a place *within* a State, not the State itself. A corporation's "nerve center," usually its main headquarters, is a single place. The public often considers it the corporation's main place of business. And it is a place within a State. By contrast, the application of a more general business activities test has led some courts, as in the present case, to look, not at a particular place within a State, but incorrectly at the State itself, measuring the total amount of business activities that the corporation conducts there and determining whether they are significantly larger than in the next-ranking State. Second, administrative simplicity is a major virtue in a jurisdictional statute. *Sisson* v. *Ruby*, 497 U. S. 358, 375. A "nerve center" approach, which ordinarily equates that "center" with a corporation's headquarters, is simple to apply *comparatively speaking*. By contrast, a corporation's general business activities more often lack a single principal place where they take place. Third, the statute's legislative history suggests that the words "principal place of business" should be interpreted to be no more complex than an earlier, numerical test that was criticized as too complex and impractical to apply. A "nerve center" test offers such a possibility. A general business activities test does not. Pp. 14–17.

(ii) While there may be no perfect test that satisfies all administrative and purposive criteria, and there will be hard cases under the "nerve center" test adopted today, this test is relatively easier to apply and does not require courts to weigh corporate functions, assets or revenues different in kind, one from the other. And though this test may produce results that seem to cut against the basic rationale of diversity jurisdiction, accepting occasionally counterintuitive results is the price the legal system must pay to avoid overly complex

jurisdictional administration while producing the benefits that ac-
company a more uniform legal system.  Pp. 17–18.

(iii) If the record reveals attempts at jurisdictional manipula-
tion—for example, that the alleged "nerve center" is nothing more
than a mail drop box, a bare office with a computer, or the location of
an annual executive retreat—the courts should instead take as the
"nerve center" the place of actual direction, control, and coordination,
in the absence of such manipulation.  Pp. 18–19.

(d) Although petitioner's unchallenged declaration suggests that
Hertz's "nerve center" and its corporate headquarters are one and the
same, and that they are located in New Jersey, not in California, re-
spondents should have a fair opportunity on remand to litigate their
case in light of today's holding.  P. 19.

297 Fed. Appx. 690, vacated and remanded.

BREYER, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–1107

## THE HERTZ CORPORATION, PETITIONER *v.* MELINDA FRIEND ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[February 23, 2010]

JUSTICE BREYER delivered the opinion of the Court.

The federal diversity jurisdiction statute provides that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated *and of the State where it has its principal place of business.*"  28 U. S. C. §1332(c)(1) (emphasis added).  We seek here to resolve different inter- pretations that the Circuits have given this phrase.  In doing so, we place primary weight upon the need for judi- cial administration of a jurisdictional statute to remain as simple as possible.  And we conclude that the phrase "principal place of business" refers to the place where the corporation's high level officers direct, control, and coordi- nate the corporation's activities.  Lower federal courts have often metaphorically called that place the corpora- tion's "nerve center."  See, *e.g., Wisconsin Knife Works* v. *National Metal Crafters*, 781 F. 2d 1280, 1282 (CA7 1986); *Scot Typewriter Co.* v. *Underwood Corp.*, 170 F. Supp. 862, 865 (SDNY 1959) (Weinfeld, J.).  We believe that the "nerve center" will typically be found at a corporation's headquarters.

I

In September 2007, respondents Melinda Friend and John Nhieu, two California citizens, sued petitioner, the Hertz Corporation, in a California state court. They sought damages for what they claimed were violations of California's wage and hour laws. App. to Pet. for Cert. 20a. And they requested relief on behalf of a potential class composed of California citizens who had allegedly suffered similar harms.

Hertz filed a notice seeking removal to a federal court. 28 U. S. C. §§1332(d)(2), 1441(a). Hertz claimed that the plaintiffs and the defendant were citizens of different States. §§1332(a)(1), (c)(1). Hence, the federal court possessed diversity-of-citizenship jurisdiction. Friend and Nhieu, however, claimed that the Hertz Corporation was a California citizen, like themselves, and that, hence, diversity jurisdiction was lacking.

To support its position, Hertz submitted a declaration by an employee relations manager that sought to show that Hertz's "principal place of business" was in New Jersey, not in California. The declaration stated, among other things, that Hertz operated facilities in 44 States; and that California—which had about 12% of the Nation's population, Pet. for Cert. 8—accounted for 273 of Hertz's 1,606 car rental locations; about 2,300 of its 11,230 full-time employees; about $811 million of its $4.371 billion in annual revenue; and about 3.8 million of its approximately 21 million annual transactions, *i.e.*, rentals. The declaration also stated that the "leadership of Hertz and its domestic subsidiaries" is located at Hertz's "corporate headquarters" in Park Ridge, New Jersey; that its "core executive and administrative functions . . . are carried out" there and "to a lesser extent" in Oklahoma City, Oklahoma; and that its "major administrative operations . . . are found" at those two locations. App. to Pet. for Cert. 26a–30a.

The District Court of the Northern District of California accepted Hertz's statement of the facts as undisputed. But it concluded that, given those facts, Hertz was a citizen of California. In reaching this conclusion, the court applied Ninth Circuit precedent, which instructs courts to identify a corporation's "principal place of business" by first determining the amount of a corporation's business activity State by State. If the amount of activity is "significantly larger" or "substantially predominates" in one State, then that State is the corporation's "principal place of business." If there is no such State, then the "principal place of business" is the corporation's "'nerve center,'" *i.e.*, the place where "'the majority of its executive and administrative functions are performed.'" *Friend* v. *Hertz*, No. C–07–5222 MMC (ND Cal., Jan. 15, 2008), p. 3 (hereinafter Order); *Tosco Corp.* v. *Communities for a Better Environment*, 236 F. 3d 495, 500–502 (CA9 2001) *(per curiam)*.

Applying this test, the District Court found that the "plurality of each of the relevant business activities" was in California, and that "the differential between the amount of those activities" in California and the amount in "the next closest state" was "significant." Order 4. Hence, Hertz's "principal place of business" was California, and diversity jurisdiction was thus lacking. The District Court consequently remanded the case to the state courts.

Hertz appealed the District Court's remand order. 28 U. S. C. §1453(c). The Ninth Circuit affirmed in a brief memorandum opinion. 297 Fed. Appx. 690 (2008). Hertz filed a petition for certiorari. And, in light of differences among the Circuits in the application of the test for corporate citizenship, we granted the writ. Compare *Tosco Corp.*, *supra*, at 500–502, and *Capitol Indemnity Corp.* v. *Russellville Steel Co.*, 367 F. 3d 831, 836 (CA8 2004) (applying "total activity" test and looking at "all corporate activities"), with *Wisconsin Knife Works*, *supra*, at 1282

(applying "nerve center" test).

## II

At the outset, we consider a jurisdictional objection. Respondents point out that the statute permitting Hertz to appeal the District Court's remand order to the Court of Appeals, 28 U. S. C. §1453(c), constitutes an exception to a more general jurisdictional rule that remand orders are "not reviewable on appeal." §1447(d). They add that the language of §1453(c) refers only to "court[s] of appeals," not to the Supreme Court. The statute also says that if "a final judgment on the appeal" in a court of appeals "is not issued before the end" of 60 days (with a possible 10-day extension), "the appeal shall be denied." And respondents draw from these statutory circumstances the conclusion that Congress intended to permit review of a remand order only by a court of appeals, not by the Supreme Court (at least not if, as here, this Court's grant of certiorari comes after §1453(c)'s time period has elapsed).

This argument, however, makes far too much of too little. We normally do not read statutory silence as implicitly modifying or limiting Supreme Court jurisdiction that another statute specifically grants. *Felker* v. *Turpin*, 518 U. S. 651, 660–661 (1996); *Ex parte Yerger*, 8 Wall. 85, 104–105 (1869). Here, another, pre-existing federal statute gives this Court jurisdiction to "revie[w] . . . [b]y writ of certiorari" cases that, like this case, are "in the courts of appeals" when we grant the writ. 28 U. S. C. §1254. This statutory jurisdictional grant replicates similar grants that yet older statutes provided. See, *e.g.,* §1254, 62 Stat. 928; §1, 43 Stat. 938–939 (amending §240, 36 Stat. 1157); §240, 36 Stat. 1157; Evarts Act, §6, 26 Stat. 828. This history provides particularly strong reasons *not* to read §1453(c)'s silence or ambiguous language as modifying or limiting our pre-existing jurisdiction.

We thus interpret §1453(c)'s "60-day" requirement as

simply requiring a court of appeals to reach a decision within a specified time—not to deprive this Court of subsequent jurisdiction to review the case. See *Aetna Casualty & Surety Co.* v. *Flowers*, 330 U. S. 464, 466–467 (1947); *Gay* v. *Ruff*, 292 U. S. 25, 28–31 (1934).

### III

We begin our "principal place of business" discussion with a brief review of relevant history. The Constitution provides that the "judicial Power shall extend" to "Controversies . . . between Citizens of different States." Art. III, §2. This language, however, does not automatically confer diversity jurisdiction upon the federal courts. Rather, it authorizes Congress to do so and, in doing so, to determine the scope of the federal courts' jurisdiction within constitutional limits. *Kline* v. *Burke Constr. Co.*, 260 U. S. 226, 233–234 (1922); *Mayor* v. *Cooper*, 6 Wall. 247, 252 (1868).

Congress first authorized federal courts to exercise diversity jurisdiction in 1789 when, in the First Judiciary Act, Congress granted federal courts authority to hear suits "between a citizen of the State where the suit is brought, and a citizen of another State." §11, 1 Stat. 78. The statute said nothing about corporations. In 1809, Chief Justice Marshall, writing for a unanimous Court, described a corporation as an "invisible, intangible, and artificial being" which was "certainly not a citizen." *Bank of United States* v. *Deveaux,* 5 Cranch 61, 86 (1809). But the Court held that a corporation could invoke the federal courts' diversity jurisdiction based on a pleading that the corporation's shareholders were all citizens of a different State from the defendants, as "the term citizen ought to be understood as it is used in the constitution, and as it is used in other laws. That is, to describe the real persons who come into court, in this case, under their corporate name." *Id.*, at 91–92.

In *Louisville, C. & C. R. Co.* v. *Letson*, 2 How. 497

(1844), the Court modified this initial approach. It held that a corporation was to be deemed an artificial person of the State by which it had been created, and its citizenship for jurisdictional purposes determined accordingly. *Id.,* at 558–559. Ten years later, the Court in *Marshall* v. *Baltimore & Ohio R. Co.*, 16 How. 314 (1854), held that the reason a corporation was a citizen of its State of incorporation was that, for the limited purpose of determining corporate citizenship, courts could conclusively (and artificially) presume that a corporation's *shareholders* were citizens of the State of incorporation. *Id.*, at 327–328. And it reaffirmed *Letson.* 16 How., at 325–326. Whatever the rationale, the practical upshot was that, for diversity purposes, the federal courts considered a corporation to be a citizen of the State of its incorporation. 13F C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §3623, pp. 1–7 (3d ed. 2009) (hereinafter Wright & Miller).

In 1928 this Court made clear that the "state of incorporation" rule was virtually absolute. It held that a corporation closely identified with State A could proceed in a federal court located in that State as long as the corporation had filed its incorporation papers in State B, perhaps a State where the corporation did no business at all. See *Black and White Taxicab & Transfer Co.* v. *Brown and Yellow Taxicab & Transfer Co.*, 276 U. S. 518, 522–525 (refusing to question corporation's reincorporation motives and finding diversity jurisdiction). Subsequently, many in Congress and those who testified before it pointed out that this interpretation was at odds with diversity jurisdiction's basic rationale, namely, opening the federal courts' doors to those who might otherwise suffer from local prejudice against out-of-state parties. See, *e.g.,* S. Rep. No. 530, 72d Cong., 1st Sess., 2, 4–7 (1932). Through its choice of the State of incorporation, a corporation could manipulate federal-court jurisdiction, for example, opening the federal courts' doors in a State where it conducted nearly all its

business by filing incorporation papers elsewhere. *Id.*, at 4 ("Since the Supreme Court has decided that a corporation is a citizen . . . it has become a common practice for corporations to be incorporated in one State while they do business in another. And there is no doubt but that it often occurs simply for the purpose of being able to have the advantage of choosing between two tribunals in case of litigation"). See also Hearings on S. 937 et al. before a Subcommittee of the Senate Committee on the Judiciary, 72d Cong., 1st Sess., 4–5 (1932) (Letter from Sen. George W. Norris to Attorney General William D. Mitchell (May 24, 1930)) (citing a "common practice for individuals to incorporate in a foreign State simply for the purpose of taking litigation which may arise into the Federal courts"). Although various legislative proposals to curtail the corporate use of diversity jurisdiction were made, see, *e.g.,* S. 937, S. 939, H. R. 11508, 72d Cong., 1st Sess. (1932), none of these proposals were enacted into law.

At the same time as federal dockets increased in size, many judges began to believe those dockets contained too many diversity cases. A committee of the Judicial Conference of the United States studied the matter. See Reports of the Proceedings of the Regular Annual Meeting and Special Meeting (Sept. 24–26 & Mar. 19–20, 1951), in H. R. Doc. No. 365, 82d Cong., 2d Sess., pp. 26–27 (1952). And on March 12, 1951, that committee, the Committee on Jurisdiction and Venue, issued a report (hereinafter Mar. Committee Rept.).

Among its observations, the committee found a general need "to prevent frauds and abuses" with respect to jurisdiction. *Id.*, at 14. The committee recommended against eliminating diversity cases altogether. *Id.*, at 28. Instead it recommended, along with other proposals, a statutory amendment that would make a corporation a citizen both of the State of its incorporation and any State from which it received more than half of its gross income. *Id.*, at 14–

15 (requiring corporation to show that "less than fifty per
cent of its gross income was derived from business trans-
acted within the state where the Federal court is held").
If, for example, a citizen of California sued (under state
law in state court) a corporation that received half or more
of its gross income from California, that corporation would
not be able to remove the case to federal court, even if
Delaware was its State of incorporation.

During the spring and summer of 1951 committee mem-
bers circulated their report and attended circuit confer-
ences at which federal judges discussed the report's rec-
ommendations. Reflecting those criticisms, the committee
filed a new report in September, in which it revised its
corporate citizenship recommendation. It now proposed
that "'a corporation shall be deemed a citizen of the state
of its original creation . . . [and] shall also be deemed a
citizen of a state where it has its principal place of busi-
ness.'" Judicial Conference of the United States, Report of
the Committee on Jurisdiction and Venue 4 (Sept. 24,
1951) (hereinafter Sept. Committee Rept.)—the source of
the present-day statutory language. See Hearings on
H. R. 2516 et al. before Subcommittee No. 3 of the House
Committee on the Judiciary, 85th Cong., 1st Sess., 9
(1957) (hereinafter House Hearings). The committee
wrote that this new language would provide a "simpler
and more practical formula" than the "gross income" test.
Sept. Committee Rept. 2. It added that the language
"ha[d] a precedent in the jurisdictional provisions of the
Bankruptcy Act." *Id.*, at 2–3.

In mid-1957 the committee presented its reports to the
House of Representatives Committee on the Judiciary.
House Hearings 9–27; see also H. Rep. No. 1706, 85th
Cong., 2d Sess., 27–28 (1958) (hereinafter H. R. Rep. 1706)
(reprinting Mar. and Sept. Committee Repts.); S. Rep. No.
1830, 85th Cong., 2d Sess., 15–31 (1958) (hereinafter
S. Rep. 1830) (same). Judge Albert Maris, representing

Judge John Parker (who had chaired the Judicial Conference Committee), discussed various proposals that the Judicial Conference had made to restrict the scope of diversity jurisdiction. In respect to the "principal place of business" proposal, he said that the relevant language "ha[d] been defined in the Bankruptcy Act." House Hearings 37. He added:

> "All of those problems have arisen in bankruptcy cases, and as I recall the cases—and I wouldn't want to be bound by this statement because I haven't them before me—I think the courts have generally taken the view that where a corporation's interests are rather widespread, the principal place of business is an actual rather than a theoretical or legal one. It is the actual place where its business operations are co-ordinated, directed, and carried out, which would ordinarily be the place where its officers carry on its day-to-day business, where its accounts are kept, where its payments are made, and not necessarily a State in which it may have a plant, if it is a big corporation, or something of that sort.
>
> "But that has been pretty well worked out in the bankruptcy cases, and that law would all be available, you see, to be applied here without having to go over it again from the beginning." *Ibid.*

The House Committee reprinted the Judicial Conference Committee Reports along with other reports and relevant testimony and circulated it to the general public "for the purpose of inviting further suggestions and comments." *Id.*, at III. Subsequently, in 1958, Congress both codified the courts' traditional place of incorporation test and also enacted into law a slightly modified version of the Conference Committee's proposed "principal place of business" language. A corporation was to "be deemed a citizen of any State by which it has been incorporated and of the

State where it has its principal place of business."  §2, 72
Stat. 415.

IV

The phrase "principal place of business" has proved
more difficult to apply than its originators likely expected.
Decisions under the Bankruptcy Act did not provide the
firm guidance for which Judge Maris had hoped because
courts interpreting bankruptcy law did not agree about
how to determine a corporation's "principal place of busi-
ness."   Compare *Burdick* v. *Dillon*, 144 F. 737, 738 (CA1
1906) (holding that a corporation's "principal office, rather
than a factory, mill, or mine . . . constitutes the 'principal
place of business'"), with *Continental Coal Corp.* v.
*Roszelle Bros.*, 242 F. 243, 247 (CA6 1917) (identifying the
"principal place of business" as the location of mining
activities, rather than the "principal office"); see also
Friedenthal, New Limitations on Federal Jurisdiction, 11
Stan. L. Rev. 213, 223 (1959) ("The cases under the Bank-
ruptcy Act provide no rigid legal formula for the determi-
nation of the principal place of business").

After Congress' amendment, courts were similarly
uncertain as to where to look to determine a corporation's
"principal place of business" for diversity purposes.  If a
corporation's headquarters and executive offices were in
the same State in which it did most of its business, the
test seemed straightforward.   The "principal place of
business" was located in that State.  See, *e.g., Long* v.
*Silver*, 248 F. 3d 309, 314–315 (CA4 2001); *Pinnacle Con-
sultants, Ltd.* v. *Leucadia Nat. Corp.*, 101 F. 3d 900, 906–
907 (CA2 1996).

But suppose those corporate headquarters, including
executive offices, are in one State, while the corporation's
plants or other centers of business activity are located in
other States?   In 1959 a distinguished federal district
judge, Edward Weinfeld, relied on the Second Circuit's

interpretation of the Bankruptcy Act to answer this question in part:

> "Where a corporation is engaged in far-flung and varied activities which are carried on in different states, its principal place of business is the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective. The test applied by our Court of Appeals, is that place where the corporation has an 'office from which its business was directed and controlled'—the place where 'all of its business was under the supreme direction and control of its officers.'" *Scot Typewriter Co.,* 170 F. Supp., at 865.

Numerous Circuits have since followed this rule, applying the "nerve center" test for corporations with "far-flung" business activities. See, *e.g., Topp* v. *Compair Inc.,* 814 F. 2d 830, 834 (CA1 1987); see also 15 J. Moore et al., Moore's Federal Practice §102.54[2], p. 102–112.1 (3d ed. 2009) (hereinafter Moore's).

*Scot*'s analysis, however, did not go far enough. For it did not answer what courts should do when the operations of the corporation are not "far-flung" but rather limited to only a few States. When faced with this question, various courts have focused more heavily on where a corporation's actual business activities are located. See, *e.g., Diaz-Rodriguez* v. *Pep Boys Corp.,* 410 F. 3d 56, 60–61 (CA1 2005); *R. G. Barry Corp.* v. *Mushroom Makers, Inc.,* 612 F. 2d 651, 656–657 (CA2 1979); see also 15 Moore's §102.54, at 102–112.1.

Perhaps because corporations come in many different forms, involve many different kinds of business activities, and locate offices and plants for different reasons in different ways in different regions, a general "business activities" approach has proved unusually difficult to apply.

Courts must decide which factors are more important than others: for example, plant location, sales or servicing centers; transactions, payrolls, or revenue generation. See, *e.g., R. G. Barry Corp., supra*, at 656–657 (place of sales and advertisement, office, and full-time employees); *Diaz-Rodriguez*, *supra*, at 61–62 (place of stores and inventory, employees, income, and sales).

The number of factors grew as courts explicitly combined aspects of the "nerve center" and "business activity" tests to look to a corporation's "total activities," sometimes to try to determine what treatises have described as the corporation's "center of gravity." See, *e.g.*, *Gafford* v. *General Elec. Co.*, 997 F. 2d 150, 162–163 (CA6 1993); *Amoco Rocmount Co.* v. *Anschutz Corp.*, 7 F. 3d 909, 915 (CA10 1993); 13F Wright & Miller §3625, at 100. A major treatise confirms this growing complexity, listing Circuit by Circuit, cases that highlight different factors or emphasize similar factors differently, and reporting that the "federal courts of appeals have employed various tests"— tests which "tend to overlap" and which are sometimes described in "language" that "is imprecise." 15 Moore's §102.54[2], at 102–112. See also *id.,* §§102.54[2], [13], at 102–112 to 102–122 (describing, in 14 pages, major tests as looking to the "nerve center," "locus of operations," or "center of corporate activities"). Not surprisingly, different circuits (and sometimes different courts within a single circuit) have applied these highly general multifactor tests in different ways. *Id.*, §§102.54[3]–[7], [11]–[13] (noting that the First Circuit "has never explained a basis for choosing between 'the center of corporate activity' test and the 'locus of operations' test"; the Second Circuit uses a "two-part test" similar to that of the Fifth, Ninth, and Eleventh Circuits involving an initial determination as to whether "a corporation's activities are centralized or decentralized" followed by an application of either the "place of operations" or "nerve center" test; the Third Circuit

applies the "center of corporate activities" test searching for the "headquarters of a corporation's day-to-day activity"; the Fourth Circuit has "endorsed neither [the 'nerve center' or 'place of operations'] test to the exclusion of the other"; the Tenth Circuit directs consideration of the "total activity of the company considered as a whole"). See also 13F Wright & Miller §3625 (describing, in 73 pages, the "nerve center," "corporate activities," and "total activity" tests as part of an effort to locate the corporation's "center of gravity," while specifying different ways in which different circuits apply these or other factors).

This complexity may reflect an unmediated judicial effort to apply the statutory phrase "principal place of business" in light of the general purpose of diversity jurisdiction, *i.e.*, an effort to find the State where a corporation is least likely to suffer out-of-state prejudice when it is sued in a local court, *Pease* v. *Peck,* 18 How. 595, 599 (1856). But, if so, that task seems doomed to failure. After all, the relevant purposive concern—prejudice against an out-of-state party—will often depend upon factors that courts cannot easily measure, for example, a corporation's image, its history, and its advertising, while the factors that courts can more easily measure, for example, its office or plant location, its sales, its employment, or the nature of the goods or services it supplies, will sometimes bear no more than a distant relation to the likelihood of prejudice. At the same time, this approach is at war with administrative simplicity. And it has failed to achieve a nationally uniform interpretation of federal law, an unfortunate consequence in a federal legal system.

## V

### A

In an effort to find a single, more uniform interpretation of the statutory phrase, we have reviewed the Courts of Appeals' divergent and increasingly complex interpreta-

tions. Having done so, we now return to, and expand, Judge Weinfeld's approach, as applied in the Seventh Circuit. See, *e.g., Scot Typewriter Co.*, 170 F. Supp., at 865; *Wisconsin Knife Works*, 781 F. 2d, at 1282. We conclude that "principal place of business" is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts of Appeals have called the corporation's "nerve center." And in practice it should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

Three sets of considerations, taken together, convince us that this approach, while imperfect, is superior to other possibilities. First, the statute's language supports the approach. The statute's text deems a corporation a citizen of the "State where it has its principal place of business." 28 U. S. C. §1332(c)(1). The word "place" is in the singular, not the plural. The word "principal" requires us to pick out the "main, prominent" or "leading" place. 12 Oxford English Dictionary 495 (2d ed. 1989) (def. (A)(I)(2)). Cf. *Commissioner* v. *Soliman*, 506 U. S. 168, 174 (1993) (interpreting "principal place of business" for tax purposes to require an assessment of "whether any one business location is the 'most important, consequential, or influential' one"). And the fact that the word "place" follows the words "State where" means that the "place" is a place *within* a State. It is not the State itself.

A corporation's "nerve center," usually its main headquarters, is a single place. The public often (though not always) considers it the corporation's main place of business. And it is a place within a State. By contrast, the

application of a more general business activities test has led some courts, as in the present case, to look, not at a particular place within a State, but incorrectly at the State itself, measuring the total amount of business activities that the corporation conducts there and determining whether they are "significantly larger" than in the next-ranking State. 297 Fed. Appx. 690.

This approach invites greater litigation and can lead to strange results, as the Ninth Circuit has since recognized. Namely, if a "corporation may be deemed a citizen of California on th[e] basis" of "activities [that] roughly reflect California's larger population . . . nearly every national retailer—no matter how far flung its operations—will be deemed a citizen of California for diversity purposes." *Davis* v. *HSBC Bank Nev., N. A.*, 557 F. 3d 1026, 1029–1030 (2009). But why award or decline diversity jurisdiction on the basis of a State's population, whether measured directly, indirectly (say proportionately), or with modifications?

Second, administrative simplicity is a major virtue in a jurisdictional statute. *Sisson* v. *Ruby*, 497 U. S. 358, 375 (1990) (SCALIA, J., concurring in judgment) (eschewing "the sort of vague boundary that is to be avoided in the area of subject-matter jurisdiction wherever possible"). Complex jurisdictional tests complicate a case, eating up time and money as the parties litigate, not the merits of their claims, but which court is the right court to decide those claims. Cf. *Navarro Savings Assn.* v. *Lee*, 446 U. S. 458, 464, n. 13 (1980). Complex tests produce appeals and reversals, encourage gamesmanship, and, again, diminish the likelihood that results and settlements will reflect a claim's legal and factual merits. Judicial resources too are at stake. Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it. *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 514 (2006) (citing *Ruhrgas AG* v. *Marathon Oil*

*Co.*, 526 U. S. 574, 583 (1999)). So courts benefit from straightforward rules under which they can readily assure themselves of their power to hear a case. *Arbaugh*, *supra*, at 514.

Simple jurisdictional rules also promote greater predictability. Predictability is valuable to corporations making business and investment decisions. Cf. *First Nat. City Bank* v. *Banco Para el Comercio Exterior de Cuba*, 462 U. S. 611, 621 (1983) (recognizing the "need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation"). Predictability also benefits plaintiffs deciding whether to file suit in a state or federal court.

A "nerve center" approach, which ordinarily equates that "center" with a corporation's headquarters, is simple to apply *comparatively speaking*. The metaphor of a corporate "brain," while not precise, suggests a single location. By contrast, a corporation's general business activities more often lack a single principal place where they take place. That is to say, the corporation may have several plants, many sales locations, and employees located in many different places. If so, it will not be as easy to determine which of these different business locales is the "principal" or most important "place."

Third, the statute's legislative history, for those who accept it, offers a simplicity-related interpretive benchmark. The Judicial Conference provided an initial version of its proposal that suggested a numerical test. A corporation would be deemed a citizen of the State that accounted for more than half of its gross income. Mar. Committee Rept. 14–15; see *supra*, at 8. The Conference changed its mind in light of criticism that such a test would prove too complex and impractical to apply. Sept. Committee Rept. 2; see also H. Rep. 1706, at 28; S. Rep. 1830, at 31. That history suggests that the words "principal place of business" should be interpreted to be no more complex than

the initial "half of gross income" test. A "nerve center" test offers such a possibility. A general business activities test does not.

B

We recognize that there may be no perfect test that satisfies all administrative and purposive criteria. We recognize as well that, under the "nerve center" test we adopt today, there will be hard cases. For example, in this era of telecommuting, some corporations may divide their command and coordinating functions among officers who work at several different locations, perhaps communicating over the Internet. That said, our test nonetheless points courts in a single direction, towards the center of overall direction, control, and coordination. Courts do not have to try to weigh corporate functions, assets, or revenues different in kind, one from the other. Our approach provides a sensible test that is relatively easier to apply, not a test that will, in all instances, automatically generate a result.

We also recognize that the use of a "nerve center" test may in some cases produce results that seem to cut against the basic rationale for 28 U. S. C. §1332, see *supra*, at 6. For example, if the bulk of a company's business activities visible to the public take place in New Jersey, while its top officers direct those activities just across the river in New York, the "principal place of business" is New York. One could argue that members of the public in New Jersey would be *less* likely to be prejudiced against the corporation than persons in New York—yet the corporation will still be entitled to remove a New Jersey state case to federal court. And note too that the same corporation would be unable to remove a New York state case to federal court, despite the New York public's presumed prejudice against the corporation.

We understand that such seeming anomalies will arise.

However, in view of the necessity of having a clearer rule, we must accept them. Accepting occasionally counterintuitive results is the price the legal system must pay to avoid overly complex jurisdictional administration while producing the benefits that accompany a more uniform legal system.

The burden of persuasion for establishing diversity jurisdiction, of course, remains on the party asserting it. *Kokkonen* v. *Guardian Life Ins. Co. of America*, 511 U. S. 375, 377 (1994); *McNutt* v. *General Motors Acceptance Corp.*, 298 U. S. 178, 189 (1936); see also 13E Wright & Miller §3602.1, at 119. When challenged on allegations of jurisdictional facts, the parties must support their allegations by competent proof. *McNutt*, *supra*, at 189; 15 Moore's §102.14, at 102–32 to 102–32.1. And when faced with such a challenge, we reject suggestions such as, for example, the one made by petitioner that the mere filing of a form like the Securities and Exchange Commission's Form 10–K listing a corporation's "principal executive offices" would, without more, be sufficient proof to establish a corporation's "nerve center." See, *e.g.,* SEC Form 10–K, online at http://www.sec.gov/about/forms/ form10-k.pdf. (as visited Feb. 19, 2010, and available in Clerk of Court's case file). Cf. *Dimmitt & Owens Financial, Inc.* v. *United States*, 787 F. 2d 1186, 1190–1192 (CA7 1986) (distinguishing "principal executive office" in the tax lien context, see 26 U. S. C. §6323(f)(2), from "principal place of business" under 28 U. S. C. §1332(c)). Such possibilities would readily permit jurisdictional manipulation, thereby subverting a major reason for the insertion of the "principal place of business" language in the diversity statute. Indeed, if the record reveals attempts at manipulation—for example, that the alleged "nerve center" is nothing more than a mail drop box, a bare office with a computer, or the location of an annual executive retreat— the courts should instead take as the "nerve center" the

place of actual direction, control, and coordination, in the absence of such manipulation.

## VI

Petitioner's unchallenged declaration suggests that Hertz's center of direction, control, and coordination, its "nerve center," and its corporate headquarters are one and the same, and they are located in New Jersey, not in California. Because respondents should have a fair opportunity to litigate their case in light of our holding, however, we vacate the Ninth Circuit's judgment and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*