AMBRO, Circuit Judge,
concurring in part and concurring in the judgment.
I agree with my colleagues that the District Court properly denied Plaintiffs’ motion to remand this case to state court. Defendants have met their burden of demonstrating that complete diversity’ exists between the opposing parties. Plaintiffs are citizens of Louisiana and Pennsylvania. Their arguments that Defendants — including Glaxo SmithKline Holdings (“GSK Holdings” or “Holdings”) and Glaxo Smith-Kline LLC (“GSK LLC”) — are also citizens of Pennsylvania I find wanting for the reasons set out in Judge Jordan’s comprehensive and well-crafted opinion. As that opinion notes, the citizenship of GSK LLC depends on the, citizenship of its sole mem *361 ber,[28] GSK Holdings, which is deemed for purposes of diversity jurisdiction a citizen “of the State or foreign state where it has its principal place of business.” 28 U.S.C. § 1332(c)(1).
I write separately because I cannot agree with the conclusion in Part III.A.2 of the majority opinion that GSK Holdings’ principal place of business is Wilmington, Delaware, where its board of directors holds very brief quarterly meetings. The parties disputed whether Holdings’ principal place of business was Delaware or Pennsylvania, and the record is limited by their adherence to this dichotomy. But I believe that the facts and law point to a third option, that GSK Holdings’ principal place of business is the United Kingdom, where the company’s strategic direction is determined. Although our difference of opinion does not affect the outcome of this case, I believe that my colleagues’ conclusion is in tension with Hertz Corp. v. Friend, 559 U.S. 77, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010), and, unless Hertz is changed or clarified by the Supreme Court, sets an incorrect precedent that will affect corporate citizenship rulings in future cases.
I.
In Hertz, the Supreme Court defined a corporation’s principal place of business under 28 U.S.C. § 1332(c)(1) as “the place where a corporation’s officers direct, control, and coordinate the corporation’s activities,” called its “nerve center.” 130 S.Ct. at 1192 (emphasis added). That nerve center is “not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).” Id. While acknowledging this limitation, my colleagues conclude that the location of the board of directors’ meetings takes on increased jurisdictional significance when the entity involved is a holding company such as GSK Holdings. Majority Op. at 353-54. Their analysis has the effect of treating holding corporations differently than operating corporations.
Without clarification from the Supreme Court, I am skeptical that a corporation’s status as a holding company changes the Hertz analysis. True, holding companies are different from operating companies because they hold and invest assets rather than manufacture, service, or sell. But whether a corporation holds or operates tells us little about its “actual center of *362 direction, control, and coordination,” metaphorically called its “brain” or “nerve center.” Hertz, 180 S.Ct. at 1192-93. The terms “hold” and “operate” refer to what a corporation does, with the assets it owns, but not necessarily who controls its actions and how extensive those actions may be. As the Court of Appeals for the First Circuit acknowledged in Taber Partners, many holding companies are more than lifeless corporate structures. They may be quite active in investing or managing their assets. Taber Partners, I v. Merit Builders, Inc., 987 F.2d 57, 63-64 n. 9 (1st Cir.1993) (explaining that the holding companies in that case “operate out of New York,” which is the location of their office, employees, bank accounts, working capital accounts, corporate books and records, and board meetings). Because holding companies have their own corporate operations (though not as extensive as a typical operating company), I don’t see the need to distinguish holding companies from the operating company addressed in Hertz.
My colleagues cite no case where a court has relied solely on the location of the board of directors’ meeting to determine a holding company’s principal place of business, nor has my research revealed one. Indeed, in all of the cases I have found— including all of the cases cited by my colleagues, see Majority Op. at 354 n. 19— district courts have determined the actual place of control of holding companies by considering the location, responsibility, and functions of corporate officers, just as Hertz requires. See, e.g., Lewis v. Lycoming, No. 11-6475, 2012 WL 2422451, at *5-6 (E.D.Pa. June 27, 2012) (determining nerve center based on place of review of monthly financial reports and strategic plans, candidate interviews, and personnel decisions); Sebastian Holdings, Inc. v. Kugler, No. 08-1131, 2012 WL 1190837, at *3 (D.Conn. Mar. 30, 2012) (determining nerve center based on officer’s travel schedule, office locations, and meetings with strategic advisors);
As district courts seem to have had no trouble applying the Hertz test to holding companies, I am unpersuaded by the majority’s argument that board of directors’ meetings should be considered for the sake of administrative simplicity. If simplicity is the goal of a rule, no doubt it is quite simple to rule that a holding company, which holds and invests assets entrusted to it, is a citizen where its directors decree formally what those investments will be. But for now the test is what the brain tells the body to do, and here I do not think that brain is in Delaware.
II.
In determining a corporation’s brain or nerve center, Hertz has us look to where the corporation’s officers make leadership decisions about the company. 130 S.Ct. at 1193. In our case, I believe that is the United Kingdom, where GSK Holdings’ “strategic direction and guidance ... emanates from.”[29] App. at 710. Julian Hes-lop, GSK Holdings’ then-highest ranking officer and stationed in the United Kingdom,[30] testified that his staff there produces the “strategy and strategic formulation” for the company and “anything that impinges upon Holdings ... that relates to *363 strategic formulation.” Id. at 710, 715. Similarly, “investment decisions for GSK Holdings,” a principal activity of a holding company, are made under the direction of its officer Sara-Jane Chilver-Stainer, who is also based in the U.K. Id. at 684.
In contrast, relatively little is done in Delaware at GSK Holdings’ perfunctory quarterly board meetings, which last from 15 to 30 minutes. Id. at 686. Two of the directors, Heslop and Michael Corrigan, often participate by phone from their'offices outside of Delaware. Id. at 695, 823. When he did attend in person, Heslop spent only enough time in Wilmington to attend Holdings’ short Board meeting. Id. at 969. Often only the third director, Donald MeLamb, a Wilmington Trust Services employee who is a director for dozens of other companies and spends less than ten hours per year on GSK Holdings, is present in Delaware. Id. at 756-57; 761-62. Board meetings consist primarily of three tasks: (1) approving or correcting minutes from the previous meeting; (2) reviewing the company’s financial statements; and (3) addressing other necessary business, such as authorizing agents to act on GSK Holdings’ behalf, approving dividend payments, or occasionally restructuring the company’s holdings. Id. at 709-10. Only the last task could be considered a form of direction, control, or coordination, and no doubt it has been in line with the wishes of Heslop (and now his successor), whose team in the U.K. determines the strategy for the company.
I do not agree with my colleagues that the record supports their conclusion that the Board actually serves as the “brain” of GSK Holdings. The District Court— whose “ruling as to jurisdiction turn[ed] largely on the differences between a ‘holding company1 and an ‘operating company5 ” — found that “Holdings’[ ] three Directors require no more than four 15- to 30-minute Board meetings a year to manage Holdings’[] affairs” and “the Board ... controls all Holdings’[ ] actions ... in Wilmington.” Johnson v. SmithKline Beecham Corp., 853 F.Supp.2d 487, 491-92 (E.D.Pa.2012). My colleagues uphold this finding, explaining that “relatively short, quarterly board meetings may well be all that is required to direct and control the company’s limited work.” Majority Op. at 354.. The record does not support that conclusion. The District Court relied on Heslop’s testimony that the “Board makes those” decisions “that actually control the activities of GSK Holdings” as well as the testimony of all three directors that Holdings cannot take “new, unauthorized” actions without Board approval. App. at 707-08, 786, 823. As Heslop rightly explains, this is “very much traditional corporate governance,” id. at 708, and could, it seems to me, be said of every corporation. A board of directors usually has the authority to make decisions that govern- the corporation, but that authority is not the same as actual control; if " it were, the nerve center test would alwáys point to the location of the board of directors’ meetings, contrary to what Hertz requires.
Moreover, these general statements of authority do not square with the scope of the activities of GSK Holdings. It “holds financial assets and liabilities” that include GSK LLC (a multi-billion dollar company and the Glaxo SmithKline family group’s primary pharmaceutical business in the United States). Id. at 593, 672. It has held “more than $10 billion of intra-[GSK] group debt,” serves as the “lead American company” for U.S. tax purposes, and “has litigated over its rights and obligations.” Id. at 593, 688-89. There is no evidence that any actual analysis presaging GSK Holdings’ major actions on these issues— such as the conversion of SmithKline Beecham to GSK LLC or Holdings’ tax, investing, and litigation strategies — occurred, or could occur, during short board meetings *364 held in Delaware. Id. at 709-10. Instead, the evidence shows that the actual oversight and control of these strategic decisions occur in the United Kingdom, and only later are made formal by Board vote.
Thus I cannot agree with my colleagues that 15 — to 80-minute meetings in Delaware — where two of the directors in effect drive by or attend by phone while the other director services myriad other holding companies in Delaware and tends to GSK Holdings for, at most, a few hours each year — establish that Holdings’ nerve center is in the state where those meetings are held. This is especially so when Hes-lop himself tells us that strategic decisions governing Holdings are made in the United Kingdom.
I worry that my colleagues’ approach will encourage parties to shift the location or formal authority of their corporate boards in order to create citizenship where those board meetings are held. My colleagues rightly state that courts have a responsibility to look past efforts at jurisdictional manipulation, but I think we likewise have a responsibility to avoid ineentivizing manipulation that would require that inquiry. A holding company should be treated like any other company under the Hertz test, looking for the “center of overall direction, control, and coordination” of the corporation, and “not simply an office where the corporation holds its board meetings.” Hertz, 130 S.Ct. at 1192, 1194.
In light of this clear language, I believe the location of board of directors’ meetings should only be deemed the nerve center of a corporation when evidence is absent that its actual guidance, supervision, and management — by its officers — occurs elsewhere. That absence is not the case here. Officers of GSK Holdings in the United Kingdom make the calls later formalized by its board of directors in Delaware. Under Hertz, its brain is thus located in the U.K.
jji }jj s|:
My colleagues have done a masterful job in addressing the parties’ arguments that GSK Holdings’ principal place of business is either in Pennsylvania or Delaware. But the United Kingdom is also in play, and here critically so. My colleagues’ rationalization of sparse facts is, in effect, that holding companies are different than operating companies for the purpose of the nerve center test. For them, this holds true until the Supreme Court tells us otherwise; for me the nerve center test applies uniformly to all companies until the Supreme Court tells us otherwise. For these reasons, I respectfully concur in the majority’s judgment and in its opinion except for Part III.A.2.

. It is undisputed that GSK LLC is headquartered- in Pennsylvania, where it operates its pharmaceutical business, and would not be diverse from Plaintiffs if it were deemed a citizen of its principal place of business. Thus our case is made more complicated by the doctrinal rule that unincorporated entities are treated like partnerships, instead of corporations, for diversity purposes. Carden v. Arkoma Assocs., 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990); Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412 (3d Cir.2010). This test has been widely criticized. See, e.g., Christine M. Kailus, Note, Diversity Jurisdiction and Unincorporated Businesses: Collapsing the Doctrinal Wall, 2007 U.. Ill. L.Rev. 1543; Debra R. Cohen, Limited Liability Company Citizenship: Reconsidering an Illogical and Inconsistent Choice, 90 Marq. L.Rev. 269 (2006); Robert J. Tribeck, Cracking the Doctrinal Wall of Chapman v. Barney: A New Diversity Test for Limited Partnerships and Limited Liability Companies, 5 Widener J. Pub.L. 89 (1995). Although this is not the case to revisit our holding in Zambelli (the issue was not even briefed and, in any event, Zambelli follows the lead of the Supreme Court in Carden), further understanding in this area may make the issue more pressing, especially if LLCs continue to complicate jurisdictional determinations. Perhaps Congress is most likely to effect change, as it did under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(l0) ('.‘[flor the purpose of this section ... an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business”).

. Like my colleagues, I am concerned solely with GSK Holdings’ principal place of business and not the nerve center of its parent or subsidiary companies. We have no reason to disregard Holdings’ separate corporate identity. Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp., 461 F.2d 1140 (3d Cir. 1972).

. Heslop retired prior to this case’s removal, but the parties proceeded on a record produced before his retirement, and there is no evidence that GSK Holdings’ corporate structure or activities changed after his departure. See Majority Op. at 342 n. 7.