WALTERS, J.,
dissenting.
Oregon should have authority to adjudicate a FELA claim brought by one of its residents against a railroad that has laid tracks and conducted its unique interstate railway business here for over one hundred years. For the reasons that follow, I would hold that this is one of the “exceptional” cases to which the court referred in Daimler AG v. Bauman, 571 US_, 134 S Ct 746, 187 L Ed 2d 624 (2014), and that defendant is “at home” in Oregon and is subject to its general jurisdiction.
In Daimler, the United States Supreme Court explained that a corporation will be “at home” in two paradigmatic places: the corporation’s place of incorporation and its principal place of business. Barrett v. Union Pacific Railroad Co., 361 Or 115, 122, 390 P3d 1031 (2017); Daimler, 134 S Ct at 760. However, the Court did not “foreclose the possibility that[,] in an exceptional case,” a corporation’s operations in another forum could be “so substantial and of such a nature as to render the corporation at home in that *134 State.” Daimler, 134 S Ct at 761 n 19 (emphasis added). This is one of those exceptional cases.
To understand why, it is important to understand the historical bases for state court jurisdiction over railroads and the Court’s reasons for circumscribing general jurisdiction in Daimler.
Before 1977, corporations, including railroads, were subject to in rem jurisdiction, meaning that they could be sued in states in which they owned real property, to the extent of that property. Under that form of jurisdiction, a corporation could be sued in a forum state in which a defendant owned property for wrongful acts that occurred outside the forum state. Thus, in Pennoyer v. Neff, 95 US 714, 723-24, 24 L Ed 565 (1877), the Supreme Court explained why the defendant’s ownership of property in Oregon provided a sufficient basis for Oregon to exercise judicial power over the defendant:
“So the State, through its tribunals, may subject property situated within its limits owned by non-residents to the payment of the demand of its own citizens against them; and the exercise of this jurisdiction in no respect infringes upon the sovereignty of the State where the owners are domiciled. Every State owes protection to its own citizens; and, when non-residents deal with them, it is a legitimate and just exercise of authority to hold and appropriate any property owned by such non-residents to satisfy the claims of its citizens. It is in virtue of the State’s jurisdiction over the property of the non-resident situated within its limits that its tribunals can inquire into that non-resident’s obligations to its own citizens, and the inquiry can then be carried only to the extent necessary to control the disposition of the property. If the non-resident [s] have no property in the State, there is nothing upon which the tribunals can adjudicate.”
At the time of Pennoyer, it was the forum state’s relationship to the defendant and the defendant’s property, and not the nature of the plaintiffs claims, that determined jurisdiction. Thus, what later was referred to as “general jurisdiction” was the basis on which all jurisdiction was justified. Mary Twitchell, The Myth of General Jurisdiction, 101 Harv L Rev 610, 614-15 (1988).
*135 That understanding of jurisdiction was the prevailing understanding when Congress enacted FELA in 1908 to provide a federal cause of action for injured workers. 361 Or at 126 (discussing legislative history of FELA). In 1910, Congress amended FELA to add what is now codified as section 56, which provides, in part:
“Under this chapter an action may be brought in a district court of the United States, in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action. The jurisdiction of the courts of the United States under this chapter shall be concurrent with that of the courts of the several States.”
45 USC § 56 (1908).
Senator William Borah of Idaho, who delivered Senate Report Number 432, H.R. 17263, 61st Congress, Second Session, 45th Congressional Record 4034 (1910), explained the intent of that amendment as “enabl[ing] the [p]laintiff to find a corporation at any point or place or state where it is actually carrying on business and there lodge his action if he chooses to do so.” Senator Borah stated that, in his view, the second sentence of that provision was not necessary because the general jurisdictional provisions applied. 45 Cong Rec 4034-35. From the text of that provision and Senator Borah’s statement, it appears that Congress intended to grant FELA plaintiffs the right to sue for injury in any state in which a railroad does business and to grant state courts personal jurisdiction over such railroads.
The majority understands the intent of Congress more narrowly. It reads FELA as giving state courts concurrent subject matter jurisdiction to hear FELA claims and as specifying the venues in which such claims may be heard. I am not sure that that is correct. As explained, at the time that FELA was enacted, state courts had unquestioned jurisdiction to adjudicate state law personal injury claims and to impose liability against railroads that owned and operated facilities within their states. In enacting FELA, Congress may well have intended to grant state courts the same jurisdictional reach when adjudicating FELA claims. *136 But, even if the majority is correct and FELA does not grant personal jurisdiction, it at least assumes it. Venue cannot lie where jurisdiction does not exist, and FELA reflects a congressional assumption that state courts will have personal jurisdiction over railroads that own and operate facilities in their states.
Two United States Supreme Court cases that the majority discusses also reflect that assumption. In Miles v. Illinois Central R. Co., 315 US 698, 62 S Ct 827, 86 L Ed 1129 (1942), and Baltimore & Ohio R. Co. v. Kepner, 314 US 44, 49, 62 S Ct 6, 86 L Ed 28 (1941), the plaintiffs did not bring actions in the states where they resided and where the railroads that injured them owned tracks. Instead, the plaintiffs brought actions in other, distant states, and the defendant railroads argued that requiring them to defend there placed a burden on interstate commerce and resulted in inequity, vexatiousness, and harassment. Miles, 315 US at 700; Kepner, 314 US at 47. In both cases, the Court held against the carriers and refused to enjoin the distant actions to proceed. Miles, 315 US at 705; Kepner, 314 US at 54. In doing so, the Court assumed, rather than decided, that the distant courts had jurisdiction over the railroads because the railroads were doing business there. But an even more basic assumption, shared by all the parties, was that the one undisputed place that the plaintiffs surely could bring their claims was in the states in which they resided and in which the railroads owned tracks. See Morris v. Missouri Pac. R. Co., 107 Neb 788, 187 NW 130 (1922) (plaintiff resident of forum state brought claim against defendant railroad in state where railroad owned tracks but that was not its place of incorporation or principal place of business); Hoogbruin v. Atchison, T. & S. F. Ry. Co., 213 Cal 582, 2 P2d 992 (1931) (same).
It was not until 1977, when the Court decided Shaffer v. Heitner, 433 US 186, 97 S Ct 2569, 53 L Ed 2d 683 (1977), that principles of Due Process limited the exercise of in rem jurisdiction based on a defendant’s ownership of property within a state. In Shaffer, the Court held that the Due Process Clause precludes the exercise of state authority in the absence of the minimum contacts required by *137 International Shoe Co. v. Washington, 326 US 310, 66 S Ct 154, 90 L Ed 95 (1945). Shaffer, 433 US at 207.[1]
In 2011, the Court placed additional limits on a state’s exercise of general jurisdiction when it held that state authority does not extend to actions against foreign corporations unless their affiliations with a forum state are “so continuous and systematic as to render them essentially at home in the forum state.” Goodyear Dunlop Tire Operations, S.A. v. Brown, 564 US 915, 131 S Ct 2846, 2853, 180 L Ed 2d 796 (2011). And, in 2014, in Daimler, the Court concluded that the defendant’s affiliations with California did not meet that test: California did not have general jurisdiction in a case arising from the torture and killing of workers in Argentina brought against a German corporation whose only connection with California was that its wholly-owned foreign subsidiary regularly sold cars there. 134 S Ct at 751.
Thus, from 1877, when Pennoyer was decided, until at least 2014, when Daimler was decided, state courts had undisputed jurisdiction to protect their residents from injuries inflicted by railroads that owned tracks and conducted substantial business within their borders. The facts in Daimler do not compel a different result here; the question is whether the Court’s reasoning necessarily does so.
In Daimler, the Court gave four reasons for holding that California did not have jurisdiction over the defendant corporation. First, the Court reviewed its decision in Goodyear and affirmed that it had “declined to stretch general jurisdiction beyond limits traditionally recognized.” Id. at 757-58. Second, the Court described the paradigm fora for the exercise of general jurisdiction over a corporation as the corporation’s place of incorporation and principal place of business. Id. at 760. The Court observed that those places have the twin virtues of being unique and easily ascertainable. Id. Third, the Court rejected as “unacceptably grasping” the plaintiffs’ suggestion that a corporation is at home in every state in which it “engages in substantial, *138 continuous, and systematic course of business.” Id. at 761. The Court explained that “[i]f Daimler’s California activities sufficed to allow adjudication of this Argentina-rooted case in California, the same global reach would presumably be available in every other State in which [it’s subsidiary’s] sales are sizeable.” Id. That, the Court reasoned, would “scarcely permit out-of-state defendants ‘to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.’” Id. at 762 (quoting Burger King Corp. v. Rudzewicz, 471 US 462, 472, 105 S Ct 2174, 85 L Ed 2d 528 (1985)). Fourth, the Court noted that a more expansive view of general jurisdiction would pose risks to international comity; other nations do not share the “uninhibited approach to personal jurisdiction” that the plaintiffs’ view represented. Id. at 763.
None of those reasons raise concerns about Oregon’s assertion of authority here. First, permitting Oregon to exercise authority to decide this case does not “stretch general jurisdiction beyond limits traditionally recognized.” Id. at 757-58. Rather, it gives effect to state jurisdictional reach that has long been assumed and exercised. It is true that, in Daimler, the Court cautioned that its decisions from the era of “Pennoyer’s territorial thinking,” basing jurisdiction only on the presence of local offices in the forum state, “should not attract heavy reliance today.” Id. at 761 n 18. However, although the Court cautioned against heavy reliance on those cases, it did not jettison them entirely. I cite Pennoyer and its description of the reasons for recognizing state authority not as determinative, but as demonstrative: It would be far more novel to preclude Oregon from exercising jurisdiction in this case than it would be to permit it.
Second, recognizing general jurisdiction in states in which interstate railroads lay tracks may be fairer to those railroads and more easily ascertainable than recognizing general jurisdiction in states in which railroads are incorporated or have their principal place of business would be. Here, for example, defendant is far more “at home” in the 23 states in which it owns tracks and conducts business than it is in Delaware, the state in which it is incorporated, but in which it does not own tracks or conduct any business. And it may be easier to ascertain the states in which a railroad *139 lays tracks than to ascertain the one state that constitutes its “principal place of business.” Here, for example, defendant takes the position that its principal place of business is in Nebraska, but it owns more tracks and employs more people in Texas. In Daimler, the Supreme Court cited Hertz Corp. v. Friend, 559 US 77, 92-93, 130 S Ct 1181, 175 L Ed 2d 1029 (2010), as providing a predictable rule for determining the “principal place of business” of a defendant. Daimler, 134 S Ct at 760. But that rule, used for determining diversity, requires consideration of “where a corporation’s officers direct, control, and coordinate the corporation’s activities.” Hertz Corp., 559 US at 92-93. For an interstate railroad, that factual inquiry could prove more complex than a determination of the states in which the railroad has laid down tracks.
Third, permitting Oregon to exercise its sovereign authority here would not require application of the test that the Court rejected in Daimler as “unacceptably grasping,” 134 S Ct at 761, nor would it offend “traditional notions of fair play and substantial justice,” International Shoe, 326 US at 316 (internal quotation marks omitted) (explaining application of Due Process Clause). I do not advocate for jurisdiction in Oregon because, as the plaintiffs argued in Daimler, defendant railroad “engages in substantial, continuous, and systematic course of business” here. 134 S Ct at 761. Although it is true that, in Oregon, defendant railroad employs 1,619 employees with an annual payroll of $244.6 million; recently generated in excess of $645 million in annual revenue; made capital expenditures in excess of $81 million; and made purchases in excess of $116 million, it is not the size of defendant’s Oregon operations on which I rely. I rely, instead, on Oregon’s right to protect one of its residents from harm done by a corporation with a permanent, physical presence here, that is, by its nature, unique.
Traversing this state with permanent tracks, defendant railroad is “at home” here in ways that other businesses are not. Defendant railroad owns and operates almost 1,100 miles of track in Oregon. It operates switching yards and locomotive facilities in Portland; operates a classification yard in Hinkle; and considers La Grande an important *140 operation and crew change point. By its very nature, a railroad requires such an extensive, physical presence.
What is more, an interstate railroad requires an extensive, physical presence in more than one state. The purpose of such a railroad is not to do business in one state or primarily in one state; its purpose is to connect the business interests in a number of states, and it is physically structured to do so. When an interstate railroad lays its tracks in and between states, it moves into each of those states in an obvious, physical way, and is as much “at home” in each one of those states as it is in any other. That does not mean, however, that interstate railroads are not able “‘to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.’” Id. at 762 (quoting Burger King Corp., 471 US at 472). Interstate railroads move into states with careful deliberation and with a great deal of governmental oversight.
Congress regulates interstate railroads at the federal level and preempts state regulation of the construction, operation, and abandonment of rail lines. See 49 USCA § 10101-11908 (1995); Emerson v. Kansas City Southern Ry. Co., 503 F3d 1126 (2007). And when railroad workers are injured, Congress provides them with a federal cause of action that is uniformly applied throughout the nation. 45 USC § 56 (1908); see Dice v. Akron, C. & Y. R. Co., 342 US 359, 361, 72 S Ct 312, 96 L Ed 398 (1952) (“[0]nly if federal law controls can the federal Act be given that uniform application throughout the country essential to effectuate its purposes.”). There is nothing “unacceptably grasping” or unfair about requiring that interstate railroads that have notice that they are subject to suit in all states in which they do business answer FELA claims in those states.
Finally, giving effect to congressional intent and Oregon sovereignty in this exceptional circumstance would raise no international comity concerns. It would be rare for a multinational corporation to own tracks or operate railroads in the United States or in Oregon, and if it did, it would do so with notice of FELA’s jurisdictional reach. Allowing Oregon to assert personal jurisdiction here would not permit all states in the union to assert jurisdiction over this railroad *141 or extend Oregon’s jurisdiction in all instances in which a foreign business operates or has a physical presence here. Rather, allowing Oregon to proceed in this case would stand only for the proposition that the business of this railroad is “so substantial and of such a nature as to render [it] at home in [this] State.” Daimler, 134 S Ct at 761 n 19.
The general jurisdictional opening that the Court preserved in Daimler may be slim, but the principles of dual sovereignty at play here should permit these plaintiffs to step through. Congress has an interest in protecting interstate railroad employees from harm and in permitting them to bring federal FELA claims in all states in which such a railroad does business. Oregon has an interest in protecting its residents from harm inflicted by railroads that own tracks traversing its lands. This is one of the “exceptional” circumstances in which defendant is essentially “at home” in Oregon, even though it is not incorporated and does not have its principal place of business here. To deny Oregon the right to exercise its sovereign authority here would be to deny its traditional exercise of its sovereign powers. I respectfully dissent.
Brewer, J., joins in this dissenting opinion.

 Applying those principles in Shaffer, the Court concluded that jurisdiction could not be premised on the defendants’ stock ownership in the forum state; defendants’ stock ownership did not constitute sufficient minimum contacts. 433 US at 216.