**Reversed and Rendered and Opinion filed September13, 2012.**



In The

# 𝔉𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝔒𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## NO. 14-11-00090-CV

**GEORGE E. GUIDRY AND DWIGHT W. ANDRUS INSURANCE, INC.,**
**Appellants**

**V.**

**ENVIRONMENTAL PROCEDURES, INC. AND ADVANCED WIRECLOTH**
**INC., Appellees**

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2003-49520**

# O P I N I O N

This is a suit by two companies against the insurance agent and agency that procured their insurance from 1991 to 1994. The insured companies asserted that the agent sold them insurance in Texas from a non-admitted carrier without the license and training to do so. They further maintained that one of their insurers became financially unstable, and that the agent's failure to disclose this lack of stability harmed them when the insurer initially did not contribute anything toward settling claims against them

related to patent infringement and unfair competition. Although the insurer ultimately reached a settlement with the insured companies, the companies alleged in this suit that the insurer was financially unable to pay their claims. They successfully argued to a jury that the agent sold them "bad insurance" and therefore was liable to them for the full $5 million that they asserted the insurer should have contributed to the settlement of the claims against them, together with punitive damages, and attorneys' fees. The agent and his employer challenge the judgment, and additionally contend that the trial court erred in failing to sanction the insured companies for filing this suit.

We conclude there is no evidence that the agent's conduct caused the damages awarded, but there is no support for the imposition of sanctions. We therefore reverse and render judgment that the insured companies take nothing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case has a lengthy factual and procedural background, much of which has been summarized in prior opinions. *See In re Guidry*, 316 S.W.3d 729 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding); *Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (op. on reh'g). Appellant Environmental Procedures, Inc. d/b/a Sweco Oilfield Services operated as a tool rental and oilfield service company; its subsidiary, appellant Advanced Wirecloth, Inc., manufactured screens used in the oil industry. *Envtl. Procedures*, 282 S.W.3d at 607. From 1991 through 1994, these entities, which we refer to collectively as "the Insureds," purchased their insurance through George Guidry, who was employed by Dwight W. Andrus Insurance, Inc. (collectively, "the Brokers"). *Id.* The Insureds maintained three layers of coverage, and often multiple insurers provided the coverage for a given layer in a particular year.

## A. The *Derrick* Litigation

In April 1993, an attorney representing the Insureds' competitor, Derrick Manufacturing Co., wrote to the Insureds threatening litigation. According to Derrick,

the Insureds' flat "shale shaker" screens infringed on its patent, and the Insureds additionally engaged in unfair competition by using Derrick's product identification number on their screens and Derrick's name on their packaging. In 1994, Derrick filed suit based on this conduct, and in 1995, Derrick filed a second suit against the Insureds and others, alleging that the defendants infringed different Derrick patents, and asserting claims of unfair competition in the manufacture, sale, and advertising of those products. *Id.* at 608. The two patent-infringement lawsuits were consolidated, and in 2001, a subsidiary of the Insureds' successor-in-interest paid $15 million to settle the *Derrick* litigation against all of the defendants. *Id.* at 608 & n.2. As part of the agreed final judgment, the Insureds and the other *Derrick* defendants admitted that they had infringed six of Derrick's patents.

## B.     The Coverage Suit

The *Derrick* litigation was immediately followed by "the Coverage suit." That case began as a declaratory-judgment action filed by an insurer that is not a party to this case, but the Insureds added claims against many other insurers for reimbursement of the costs of defending and settling the *Derrick* litigation. For the purpose of this suit, the only relevant insurer involved in the Coverage suit was Ocean Marine Indemnity Company, referred to at trial as "OMI." OMI provided the Insureds $5 million in umbrella coverage for the one-year period from October 1, 1992 through September 30, 1993. *Id.* at 608. OMI disputed coverage, and in 2001, the Insureds settled their claims against OMI for $500,000.

## C.     The Broker-Liability Suit

The Coverage suit was followed by this suit, the "Broker-Liability suit." In 2003, the Insureds sued the Brokers, alleging that they were liable for the costs of defense and settlement of the *Derrick* litigation to the extent that any of these expenses were or should have been covered by insurance but remained unpaid. *Id.* at 608–09. The trial court granted partial summary judgment in the Brokers' favor on the Insureds' claims of negligence, negligent misrepresentation, and violations of former article 21.21 of the

3

Texas Insurance Code, and the remaining claims were tried before a jury in 2005. The trial court granted a directed verdict in the Brokers' favor on the Insureds' claims for breach of fiduciary duty and rendered judgment on the jury's verdict in the Brokers' favor on the Insureds' fraud claims. *Id.* at 609–10. On appeal, we reversed the summary judgment, but affirmed the judgment in all other respects. *Id.* at 610. We accordingly remanded the Insureds' claims of negligence, gross negligence, and violations of former article 21.21 of the Texas Insurance Code. *Id.* at 610.[1]

Immediately before the second jury trial, the Insureds dropped their claims arising from each insurer's failure to pay the full amount that allegedly was or should have been covered under its respective policy—with one exception. The Insureds continued to allege that the Brokers were liable for OMI's failure to contribute its entire $5 million limit of liability toward the cost of settling the *Derrick* litigation. They produced evidence that although Guidry was licensed to sell insurance in Louisiana, he was not licensed to sell insurance in Texas or licensed in either state to sell surplus-lines insurance, i.e., coverage obtained from a carrier that is not admitted to the business of insurance in the state. As it was explained to the jury, the difference between admitted carriers and surplus-lines carriers is that "admitted carriers have to make a contribution to a fund, which is called an insolvency fund; and if you buy insurance from an admitted carrier that goes broke, you do have some recourse for your unsatisfied claims . . . . You don't have that with surplus-lines companies . . . ." OMI was a Louisiana insurance company and was admitted to business there, but Guidry sold the Insureds the policies in Texas, and OMI was not admitted to do business here.

The Insureds faulted Guidry not only for placing their umbrella coverage with a surplus-lines carrier, but in particular, for obtaining insurance from OMI. When Guidry procured the insurance, OMI was eligible for admittance to the business of insurance in

---

[1] Between the first and second jury trials, the case was briefly before us again when the Brokers filed a petition for writ of mandamus. We agreed that the trial court abused its discretion in denying their motion to disqualify one of the Insureds' attorneys. Because the attorney was expected to be an important fact witness on the issue of the Brokers' limitations defense, we conditionally granted the writ. *In re Guidry*, 316 S.W.3d 729, 740–41 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding).

Texas and had a rating of "A-" (signifying "Excellent") in *Best's Insurance Reports*, most commonly referred to at trial simply as *Best's*. *Best's* is considered "the most authoritative guide that insurance agents look to for information by the insurance companies."[2]  In November 1992—one month after the policy's inception, but one month before the Insureds actually received a copy of the cover note evidencing coverage—an article that potentially affected OMI was published in the Louisiana edition of *Surplus Lines Reporter*, an industry publication to which Guidry's employer subscribed. Although OMI was not mentioned in the article, the author referred to Gulf Coast Marine, Inc., which was the managing general agency that handled OMI's financial affairs, and to Gulf Coast Marine's president and majority shareholder, Dieter Hugel, who also was OMI's president and chairman of its board.  According to the article, the Louisiana Commissioner of Insurance named Gulf Coast Marine and Hugel as defendants in a lawsuit in which it was alleged that Hugel helped to hide the insolvency of a different insurance company, Alliance Casualty and Reinsurance Co., by temporarily transferring money to it when that company's financial statements to Louisiana's Department of Insurance were due, then moving the money out again.  The Insureds contend that Guidry had a duty to inform them about these allegations.

In July 1993—more than nine months into the policy year, and two months after Derrick's cease-and-desist letter—*Best's* reduced OMI's rating to "D," signifying that its "financial condition and operating performance" was "below minimum standards."  In the same edition of *Best's*, it was reported that OMI had stopped writing excess-liability coverage on December 1, 1992 and that its reinsurance treaty had not been renewed or replaced.  Guidry did not disclose this information to the Insureds, and when the OMI policy expired less than ninety days later, he procured insurance for 1993–1994 from another insurer.

---

[2] At trial, it was explained that "A.M. Best Company . . . publishes financial disclosure statements on all the insurance companies in the United States, . . . and they collate their information from the financial audits of insurance companies during a calendar year . . . [and] the book is published, maybe, six or seven months later."

Based on the conduct described above, the Insureds asserted that Guidry was liable (and his employer was vicariously liable) under various theories of liability for (1) $5 million, representing OMI's limit of liability for all covered claims; (2) the difference between the policy's value and the $75,000 premium paid for its coverage; (3) punitive damages; and (4) attorneys' fees. At trial, however, the Insureds successfully argued to the trial court that the jury should not be allowed to see their settlement agreement with OMI or hear testimony that they had settled their coverage dispute with OMI for $500,000. They then argued to the jury that they had paid $75,000 for $5 million of coverage, evidenced by a cover note that "was not worth the two pages it was written on."

The jury found that Guidry was negligent and that he knowingly violated the Insurance Code. Under these theories of liability, jurors were asked to assess damages represented by (1) "[t]he amount of the *Derrick* settlement that should have been paid by the OMI policy,"[3] and (2) "[t]he difference, if any between the value of what [the Insureds] received in the transaction and the purchase price or other value given for it." The jury found that OMI should have contributed $5 million to the *Derrick* settlement, and that the difference between the policy's $75,000 price and its value was $75,000. The jury also found that Guidry was liable for negligent misrepresentation.[4] In response to the damages question associated with this theory of liability, the jury found that the negligent misrepresentation caused no economic loss, but that Guidry's conduct caused a difference of $375,000 between the "value of what [the Insureds] received in the transaction and the purchase price or other value given for it." Finally, the jury assessed punitive damages of $1 million and attorneys' fees of $350,000.

The trial court denied the Brokers' motion for judgment notwithstanding the verdict,[5] and the Insureds elected to recover for their statutory claims. After reducing the

---

[3] Italics added.

[4] The Insureds' claims under the Unauthorized Insurance Act were addressed in an earlier trial and were not retried.

[5] The trial court granted their motion to modify, correct, or reform the judgment as it pertained to

6

damages by the $500,000 that OMI already had paid to settle the Insureds' claims under the policy, the trial court rendered judgment against the Brokers for $4.5 million in actual damages, $1 million in punitive damages, and $350,000 in attorneys' fees, together with pre- and post-judgment interest. The Brokers' motion for new trial was overruled by operation of law.

## II. ISSUES PRESENTED

In their first stated issue, the Brokers contend that there was "no evidence of damages for the amount that 'should have been paid by the OMI policy' because there was no coverage under the policy." In their second issue, they contend that the Insureds' claims are barred by limitations. They assert in their third issue that Guidry made no misrepresentations about the OMI policy or about OMI's financial stability, and that none of his actions harmed the Insureds. The Brokers argue in their fourth issue that there was no knowing violation of the Texas Insurance Code. We treat as a fifth issue their argument that the trial court erred in failing to sanction the Insureds for violating Rule 13 of the Texas Rules of Civil Procedure.

## III. STANDARD OF REVIEW

The issue that is dispositive of the Insureds' claims concerns the legal sufficiency of the evidence. In a legal-sufficiency challenge, we review the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 819 (Tex. 2012) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005)). We further presume that jurors drew all inferences in favor of the verdict, but only if reasonable minds could do so. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). We will sustain a no-evidence challenge when "(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or

the correction of an interest calculation.

7

(d) the evidence conclusively establishes the opposite of the vital fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). Evidence is legally sufficient if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). On the other hand, "[j]urors may not simply speculate that a particular inference arises from the evidence. *Serv. Corp. Int'l*, 348 S.W.3d at 228. If the evidence does no more than create a mere surmise or suspicion, then it is no evidence. *Id.*

## IV. ANALYSIS

The trial court awarded actual damages consisting of the $5 million that the jury found was the amount of the Derrick settlement that should have been paid by the OMI policy, reduced by the $500,000 that OMI paid to settle the Insureds' claims against it. We therefore determine whether the evidence is sufficient to support the jury's finding that Guidry caused the Insureds $5 million in damages, because this is the only finding of actual damages on which the judgment was based.

## A. Difference Between the Amount the Insureds Received and the Amount They Should Have Received

The Insureds argued that Guidry is liable to them for the full limits of the OMI policy because he failed to disclose that OMI was a surplus-lines carrier and that he was not licensed to sell them insurance. According to the Insureds, if Guidry had been licensed to sell surplus-lines insurance in Texas, he would have known that, before procuring insurance from a surplus-lines carrier, it first must be determined that insurance is not available from an admitted carrier. They further assert that if Guidry had the proper licenses, then he would have known that the cover note confirming that insurance was obtained from a surplus-lines carrier must contain the following disclosure:

> This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and the insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462,

8

Insurance Code. Chapter 225, Insurance Code, requires payment of a _____ (insert appropriate tax rate) percent tax on gross premium.

TEX. INS. CODE ANN. § 981.101 (West 2009). Finally, they assert that if Guidry had been licensed in Texas, he also would have known that, before placing coverage with a surplus-lines carrier, he had a duty to investigate the carrier's financial condition and the trustworthiness of its management by consulting *Best's* and more contemporaneous sources such as the Louisiana edition of *Surplus Lines Reporter*.

It is undisputed that Guidry is not licensed to sell insurance in Texas; that he is not licensed to sell surplus-lines insurance anywhere; that OMI is a surplus-lines carrier; that the cover note did not contain the warning required by statute; and that Guidry did not disclose any of this information to the Insureds. Based on the testimony presented, a reasonable jury also could conclude that Guidry did not attempt to procure insurance from an admitted carrier before placing the insurance with a surplus-lines carrier; did not look at *Best's* report on OMI; and did not review the Louisiana edition of *Surplus Lines Reporter*.

But, determining that Guidry failed to comply with his statutory and common-law duties does not answer the question of whether his acts or omissions caused the Insureds any damages. "Breach . . . and causation are separate inquiries, . . . and an abundance of evidence as to one cannot substitute for a deficiency of evidence as to the other." *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 119 (Tex. 2004). We therefore determine whether there is legally sufficient evidence that any of Guidry's actions or inactions caused the actual damages on which the judgment is based.

### 1.   *No evidence that an admitted carrier would have contributed more to the Derrick settlement*

In order to prove causation of damages from the failure to place the coverage with an admitted carrier, the Insureds had to prove that an admitted carrier would have contributed more to the *Derrick* settlement than OMI did. Without such evidence, the Insureds could not show that Guidry's failure to place the insurance with an admitted carrier caused the Insureds to receive anything less than they otherwise would have

9

done.[6]  To make such a showing, the Insureds had to present evidence that (a) they could have obtained insurance from an admitted carrier, and (b) the admitted carrier would have paid more toward the *Derrick* settlement than OMI did.[7]

Only one of the two Insureds satisfied the first requirement.  There is evidence that when Guidry procured coverage from OMI in late 1992, a policy covering one of the two Insureds—Advanced Wirecloth—could have been purchased from an admitted carrier; however, there is no evidence that a policy from an admitted carrier was available at that time to Environmental Procedures, the other Insured.  Thus, there is no evidence that Guidry's failure to purchase insurance from an admitted carrier caused Environmental Procedures damage.

Neither Insured overcame the second obstacle; that is, there is no evidence that the Insureds would have received a larger contribution toward the *Derrick* settlement if their umbrella policy had been purchased from an admitted carrier.  To show that an admitted carrier would have paid anything at all toward the *Derrick* settlement, evidence was needed that a policy available to the Insureds for that coverage period from an admitted carrier would have provided coverage for the *Derrick* claims.  *Cf. Metro Allied Ins. Agency, Inc. v. Lin*, 304 S.W.3d 830, 835–36 (Tex. 2009) (per curiam) (pointing out that to prove that the insurance agent's negligent procurement was the cause-in-fact of the plaintiff's damages, the plaintiff must show that coverage for his claims could have been obtained, because in the absence of available coverage, "the injury would have been the same regardless").  Here, however, there is no evidence that insurance then available

---

[6] The trial court sustained the Insureds' objections to allowing the jury to hear any evidence about the amount that OMI actually paid, and this evidence was admitted "for the court's eyes only."  We need not address this ruling, because it does not affect our analysis.  Even if it were true that OMI paid nothing toward the *Derrick* settlement, the Insureds could not show that they were damaged absent evidence that they could have purchased insurance from a different carrier that would have contributed some amount to the settlement.

[7] There is no evidence linking OMI's status as a non-admitted carrier with its failure to pay a larger amount toward the *Derrick* settlement.

from an admitted carrier would have covered the *Derrick* claims.[8]

Here, the only evidence that any carrier might have covered such claims at any time is a letter that Guidry wrote to the Insureds on October 2, 1995, after they switched their business to a new insurance agent, from whom they purchased a policy with "Zurich." In the letter, Guidry discussed the change and wrote that "Zurich began actively pursuing energy accounts this summer shortly after they purchased another company, The Home." He expressed regret at losing the Insureds' business, and in a postscript, Guidry wrote as follows:

> [A] sale of a screen with knowledge of an alledged [sic] patent infringement should be an occurrence by definition under an insurance policy. Any sales after September 30, 1995 would occur after you have cancelled your policy with me and therefore [are] not covered under that policy. I recommend that you contact your new agent and ask them to put Zurich on notice of an ongoing claim so that they can have their attorneys protect Zurich's interest on any future sales. If they are not made aware of the ongoing claim and an adverse ruling is made against [the Insureds], they will take the position that their interest was prejudiced by [the Insureds'] failure to notify them. This could result in Zurich's total denial of this claim.

Even if, as Guidry implied, Zurich began providing coverage to the Insureds in 1995 for

---

[8] If the jury's liability finding was based on Guidry's failure to procure insurance from a different carrier at the start of the coverage period, then to prove causation of damages, the Insureds had to show that a policy was then available to the Insureds covering *future* claims of patent infringement, trademark infringement, and unfair competition. But, if liability was based on Guidry's failure to tell them about the drop in OMI's *Best's* rating in July 1993—months after the Insureds received a cease-and-desist letter from Derrick—then the Insureds had to make the more difficult showing that they could have replaced the OMI policy with a retroactive policy from a more highly rated carrier that would have covered the claims asserted in the *Derrick* litigation. This would have been more difficult to prove in light of the existing law. *See Two Pesos, Inc. v. Gulf Ins. Co.*, 901 S.W.2d 495, 502 (Tex. App.—Houston [14th Dist.] 1995, no writ) (op. on reh'g) (holding that loss-in-progress principles barred coverage for injuries from trade-dress infringement that were manifested before the policy was purchased, because "[t]he risk of injury from continued infringement was readily apparent, or should have been"); *accord*, *Franklin v. Fugro-McClelland (Sw.), Inc.*, 16 F. Supp. 2d 732, 733–35 (S.D. Tex. 1997) (holding that the loss-in-progress doctrine barred coverage from excess insurer for "patent infringement, misappropriation of trade secrets, and other related causes of action" because the insured purchased the policy after receiving a cease-and-desist letter from the patent holder). But, regardless of whether liability was based on Guidry's conduct in initially placing the coverage with OMI or in failing to replace the insurance covering the 1992–93 term after OMI's rating dropped, there is no evidence in the record that a different carrier would have sold the Insureds a policy covering the *Derrick* claims.

patent-infringement claims for "future sales," there is no evidence that such coverage was available to the Insureds when Guidry procured insurance from OMI three years earlier. *See also id.* at 836 ("An insurance agent's independent representations may affect his responsibilities to his client, but they cannot add to or alter the coverages of any insurance contract or provision.").[9]

### 2. *No evidence that OMI's financial condition caused it to contribute less toward the* **Derrick** *settlement*

The Insureds fault Guidry for procuring insurance from a company that was financially unsound when the policy was purchased; alternatively, they assert that Guidry is liable for failing to inform them that OMI became financially unsound after coverage was placed. The Insureds presented expert testimony that a licensed surplus-lines agent would have investigated the financial strength of a company such as OMI "[i]f they were going to place coverage with them." The same witness testified that this investigation would have meant consulting *Best's* and contemporaneous trade publications such as *Surplus Lines Reporter. See Higginbotham & Assocs., Inc. v. Greer*, 738 S.W.2d 45, 47 (Tex. App.—Texarkana 1987, writ denied) (holding that an agent is not liable for "an insured's lost claim due to the insurer's insolvency" if the insurer was solvent when the insurance was procured "unless at that time or at a later time when the insured could be protected, the agent knows or by the exercise of reasonable diligence should know, of facts or circumstances which would put a reasonable agent on notice that the insurance presents an unreasonable risk"). We have found no Texas case applying these principles to allow recovery against an insurance agent in the absence of evidence that the carrier was insolvent, and here, there is no such evidence.[10] There is no direct evidence that

---

[9] There also is no evidence that Zurich was an admitted carrier; that it was more highly rated than OMI; or that it would have covered a loss in progress.

[10] There also is no evidence of the date on which coverage was placed, and thus, no evidence that any reports adverse to OMI were available during the time that, according to the Insureds, Guidry should have been investigating the carrier before procuring insurance from it. Instead, the Insureds presented evidence concerning three other periods of time: November 1992, December 1992, and July 1993.

In November 1992, the article about Hugel and Gulf Coast Marine, Inc. appeared; however, OMI is not mentioned in the article. There is no evidence that any allegations were made that Hugel or others

OMI was financially unable to pay its covered claims, and the circumstantial evidence that the Insureds cite for this point is legally insufficient.

The Insureds contend that the jury reasonably could infer that OMI lacked the funds to pay covered claims based on evidence that (a) OMI stopped issuing new policies, and (b) its rating from *Best's* dropped sharply. But there was no evidence that a carrier that is no longer issuing new policies or that has suffered a drop in rating generally is unable to pay the covered claims of its existing policyholders. The Insureds' expert testified that "Highlands," a different insurer, is no longer selling new insurance policies, but is not bankrupt and is still paying claims. Because this evidence only supports an inference that is counter to the jury's finding, we assume that the jury disregarded this testimony. The Insureds' expert also testified that a carrier's ability to pay is determined by its net worth, but no evidence was offered as to OMI's net worth at any time when it might have been obliged to pay the Insureds. The OMI policy is one of indemnity, but the Insureds had no legal obligation to pay Derrick until 2001. Thus, if the OMI policy covered any of the *Derrick* claims—a question we do not reach—then its obligation to indemnify the Insureds arose no earlier than 2001. The most recent evidence offered at

engaged in financial misconduct in connection with OMI, and there is no evidence that misconduct by Hugel or Gulf Coast Marine, Inc. in other areas caused OMI to be unable to contribute all it should have done to the *Derrick* settlement.

At the end of December 1992, another broker sent the cover note to Guidry, who forwarded it to the Insureds. The cover note confirmed that coverage already had been placed and was effective on October 1, 1992. There was no expert testimony that Guidry should have investigated a carrier upon receipt of a cover note, but even if this could be implied, there is no evidence that his failure to do so harmed the Insureds. The only evidence of potentially adverse information available at that time was the article concerning the allegations against Hugel and Gulf Coast Marine, Inc., and no evidence links these allegations to the amount of OMI's contribution to the *Derrick* settlement.

In July 1993, OMI's *Best's* rating dropped and information was published that OMI's reinsurance treaty had been canceled and it had stopped writing excess-liability policies in December 1992. There is no evidence that Guidry should have discovered this information before July 1993 or that a licensed agent would have done so. There also is no evidence linking any of this information with the amount that OMI paid the Insureds.

Finally, even if one assumes that a "better" agent would have concluded from any of this evidence that OMI presented an unreasonable risk, Guidry's failure to take any action could have harmed the Insureds only if the OMI policy could have been replaced with a policy from a "better" carrier, and the replacement carrier would have covered the *Derrick* claims. There is no such evidence.

13

trial of OMI's net worth was a 1997 edition of *Best's*, in which it was reported that OMI's "invested assets exceeds liabilities." There is no evidence that this subsequently changed. Thus, the jury could only speculate as to the reason that OMI did not pay the Insureds anything at the time of the *Derrick* settlement in 2001. The jury might suspect that OMI was in decline when the insurance was placed, and might assume that another company would have contributed more toward the *Derrick* settlement, but "we are not empowered to convert mere suspicion or surmise into some evidence." *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993).

### 3. *No evidence that the statutory warning would have made any difference to the Insureds*

The Insureds also testified that under Texas law, the cover note from a surplus-lines carrier must contain certain disclosures, and that information was omitted from OMI's cover note. There was no evidence, however, that the Insureds would have done anything differently—or could have done anything differently—if they had received the required statutory warning that no payments from the insolvency fund would be made in the event that the surplus-lines carrier became insolvent. The omission of this warning could have harmed the Insureds only if (a) the Insureds could have obtained coverage for the *Derrick* claims from an admitted carrier; (b) OMI failed to pay a covered claim due to insolvency; and (c) in the event that the admitted carrier became insolvent, the Insureds would have been paid a larger amount from the insolvency fund than they were paid by OMI. But, the Insureds did not present evidence or request a finding or that, but for Guidry's acts and omissions, they could have obtained coverage for the *Derrick* claims from an admitted carrier, or that, upon the admitted carrier's insolvency, they would have received from an insolvency fund a payment toward the *Derrick* settlement that was larger than the amount contributed by OMI. There is no evidence that such coverage was available, and no evidence that OMI was insolvent.

### 4. *No evidence that the failure to investigate the trustworthiness of OMI's management caused the Insureds' damages*

The Insureds also argued that Guidry had a duty to investigate the trustworthiness

of OMI's management, and that his failure to do so caused their damages. Specifically, they contend they were harmed by Guidry's failure to discover or disclose to them the allegations against Hugel in the November 1992 issue of the Louisiana edition of *Surplus Lines Reporter*. There is no evidence, however, that Guidry's failure to tell the Insureds about the allegations against Hugel caused the Insureds to receive less money toward the costs of settling the *Derrick* litigation than they otherwise would have received.

Guidry's failure could have caused such damage only if the Insureds would have responded to the information by replacing the policy with one that provided coverage for the *Derrick* claims and that was obtained from a carrier with more trustworthy management. But, there is no evidence that a policy available to the Insureds from any other carrier would have provided coverage for the *Derrick* claims. In the absence of such evidence, the jury could not reasonably conclude that Guidry's failure to discover the allegations against Hugel or to tell the Insureds about them had any effect on the amount that the Insureds later received toward the *Derrick* settlement.

> **5.      *No evidence that the Insureds would have received a larger contribution to the settlement if their insurance had been procured through a licensed agent***

In order to prove that Guidry's failure to hold the proper licenses caused them to receive a lower contribution to the *Derrick* settlement, the Insureds had to produce evidence that they would have received more if their umbrella insurance had been purchased through a licensed agent. There is no such evidence. The Insureds instead argued that a surplus-lines agent licensed in Texas would have been better qualified. Specifically, they argued that a licensed agent would have known that (a) before procuring insurance from a surplus-lines carrier, an agent must determine that insurance is not available from an admitted carrier; (b) a surplus-lines agent must investigate the financial condition of surplus-lines carriers; (c) a cover note from a surplus-lines carrier must contain certain disclosures that were omitted here; and (d) a surplus-lines agent must inquire into the trustworthiness of the carrier's management. But, again, there is no evidence that a different carrier would have provided coverage for the *Derrick* claims.

15

As a result, there is no evidence that Guidry's failure to know all that a licensed agent would know or to disclose his lack of licensure caused the Insureds to receive less of a contribution toward the *Derrick* settlement than they otherwise would have received. In the absence of evidence that coverage for the claims was available from a different carrier, the Insureds cannot show that their reliance on Guidry and OMI placed them in a worse position.

On this record, the evidence is legally insufficient to support the finding that Guidry's violations of the Insurance Code caused the Insureds to receive less in indemnity for the *Derrick* settlement than they otherwise would have received. We therefore sustain the portion of the Brokers' first and third issues in which they argued there is no evidence that the Insureds were damaged by Guidry's conduct. In light of our disposition of these issues, we do not reach the Brokers' second issue, which concerns their limitations defense, or their fourth issue, in which they assert there was no evidence that Guidry's violations of the Insurance Code were committed "knowingly."

## B.    The Remaining Damages Found by the Jury

On original submission, the parties were not required to address the question of whether, in the event the trial court's judgment was reversed, the Insureds were entitled to any recovery under an alternative theory. *See Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988) ("When the jury returns favorable findings on two or more alternative theories, the prevailing party need not formally waive the alternative findings. That party may seek recovery under an alternative theory if the judgment is reversed on appeal."). We have said, however, that if alternative bases for judgment have been briefed by the parties, we can address the matter on original submission. *See Hatfield v. Solomon*, 316 S.W.3d 50, 60 n.3 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Here, however, neither side has addressed questions such as the sufficiency of the evidence to support the jury's other damage findings. Rather than hold that either side has waived through inadequate briefing an argument it was not required to brief at all, we conclude that any election of an alternative theory of recovery under *Boyce Iron Works*

16

has not been sufficiently briefed to permit us to address the matter on original submission.

## C.     Punitive Damages and Attorneys' Fees

Based on the jury's finding that Guidry misrepresented an insurance policy or the financial condition of an insurer, the trial court awarded the Insurers attorneys' fees of $350,000 and exemplary damages of $1 million, as found by the jury. *See* TEX. INS. CODE ANN. § 541.152(a)(1) (West Supp. 2011) ("A plaintiff who prevails in an action under this subchapter may obtain . . . the amount of actual damages, plus court costs and reasonable and necessary attorney's fees . . . ."); *id.* § 541.152(b) ("[O]n a finding by the trier of fact that the defendant knowingly committed the act complained of, the trier of fact may award an amount not to exceed three times the amount of actual damages.").[11] A plaintiff who does not recover actual damages cannot recover attorneys' fees under the Insurance Code. *State Farm Life Ins. v. Beaston*, 907 S.W.2d 430, 437 (Tex. 1995). And if the plaintiff cannot recover actual damages, then any award of exemplary damages necessarily would "exceed three times the amount of actual damages." TEX. INS. CODE ANN. § 541.152(b). Having concluded that no evidence supports the trial court's award of actual damages, we similarly conclude that the Insureds are not entitled to an award of attorneys' fees or exemplary damages.

## D.     Failure to Sanction the Insureds

Although the Brokers did not raise this argument as a distinct issue, they contend on appeal that the trial court erred in denying their "counterclaim" under Texas Rule of Civil Procedure 13 for attorneys' fees incurred in defending against the Insureds' claims. Texas Rule of Civil Procedure 13 does not establish an independent cause of action for damages, but instead provides a basis for a trial court to impose sanctions "upon motion or upon its own initiative." We therefore construe this portion of the Brokers' pleading

---

[11] Although the Insureds' claims accrued under former article 21.21 of the Texas Insurance Code, the sections relevant to their claims were recodified in 2003. The Insureds have cited to the current version of the Texas Insurance Code, and we have done so as well.

17

not as a counterclaim for damages but as a motion for sanctions. *See Haase v. Pearl River Polymers, Inc.*, No. 14-11-00024-CV, 2012 WL 3229007, at \*2 n.4 (Tex. App.—Houston [14th Dist.] Aug. 9, 2012, no pet. h.) (mem. op.) (treating as a motion for sanctions the allegation in plaintiff's pleading that "the defendants 'are guilty of violating'" Texas Rule of Civil Procedure 13); *Mantri v. Bergman*, 153 S.W.3d 715, 717 (Tex. App.—Dallas 2005, pet. denied) ("The Texas courts have treated proceedings for sanctions as motions, not as independent causes of action.").

The Brokers asserted that they are entitled to attorneys' fees and costs because the Insureds brought this suit in violation of Rule 13 of the Texas Rules of Civil Procedure. Rule 13 provides in pertinent part as follows:

> The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. . . . If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose an appropriate sanction available under Rule 215.1 upon the person who signed it, a represented party, or both.

TEX. R. CIV. P. 13.

On appeal, the Brokers rely on evidence that does not appear to have been offered in the trial court in support of their request for sanctions. In the trial court, the Brokers made the general assertion that this "lawsuit . . . is groundless, untimely, barred by limitations, brought in bad faith and constitutes a violation of Rule 13," but they cited no evidence. On appeal, they have cited affidavits from their own counsel concerning the amount of attorneys' fees incurred in defending this suit, but that appears to be the only evidence to which the trial court was referred in support of their request for sanctions. In their brief, they cite several oral statements made in the trial court by counsel for the Insureds, and contend that the statements support the imposition of sanctions, but Rule 13 applies only to signed documents. They also refer to documents filed by the Insureds when attempting to quash the deposition of a corporate representative, but these

18

documents cannot have been the basis for the Brokers' request for sanctions, because they were signed and served after sanctions were requested. Finally, the Brokers cite generally to a 477-page document that is a collection of more than 70 exhibits offered in connection with their limitations defense. Although they state that these exhibits were excluded from evidence at trial, they have not indicated that the material was offered in support of their request for sanctions.

Because the record does not show that the trial court was ever asked to sanction the Insureds for any conduct to which Rule 13 applies, we conclude that the trial court did not abuse its discretion in failing to grant the Brokers' motion for sanctions.[12] We accordingly overrule this issue.

## V. CONCLUSION

No evidence supports the Insureds' claim that their insurance agent's acts or omissions caused them to be paid less in indemnity for the *Derrick* settlement than they otherwise would have received. We therefore reverse the trial court's judgment and render judgment that the Insureds take nothing by their claims. In addition, because the Brokers failed to show that the trial court abused its discretion in failing to sanction the Insureds, we decline to disturb that ruling.


/s/ Tracy Christopher
   Justice


Panel consists of Justices Frost, Brown, and Christopher.

---

[12] Although there appears to be no written order on the request for sanctions, the trial court stated in open court that it was "denying the counterclaim."

19