**ST. PAUL FIRE AND MARINE INSURANCE CO., Plaintiff,**

v.

**SCOPIA WINDMILL FUND, LP, Scopia Capital Management, LLC, and Scopia GP, LLC, Defendants.**

**No. 14–cv–8002 (JSR).**

United States District Court, S.D. New York.

Signed Feb. 19, 2015.

Joseph Edward Boury, Beth ann Saydak, Litchfield Cavo, New York, NY, Robert L. Ciociola, Litchfield Cavo LLP, Lynnfield, MA, for Plaintiff.

Jonathan David Pressment, Haynes and Boone, LLP, New York, NY, Noah Herman Nadler, Werner A. Powers, Haynes and Boone, LLP, Dallas, TX, for Defendants.

### MEMORANDUM

JED S. RAKOFF, District Judge.

Plaintiff St. Paul Fire and Marine Insurance Co. ("St. Paul") brings this diversity action against defendants Scopia Windmill Fund, LP, Scopia Capital Management, LLC, and Scopia GP, LLC (collectively, "Scopia"), seeking a declaratory judgment that an insurance policy that St. Paul issued to Scopia does not provide coverage for certain legal fees, costs, and liabilities that Scopia incurred as a result of its involvement in separate litigation in Texas. On November 21, 2014, Scopia filed a motion to dismiss for lack of subject matter jurisdiction or, in the alternative, to abstain. In a January 16, 2015 Order, the Court denied Scopia's motion for abstention, but reserved judgment on the motion to dismiss and instead ordered an evidentiary hearing to supplement the record of where St. Paul's principal place of business is located. Following that hearing, on January 30, 2015, the Court denied the motion to dismiss as well. This Memorandum explains the reasons for the Court's January 16 and January 30 Orders.

According to the Complaint, this litigation has its roots in an investment made in

2012 by defendant Scopia Windmill Fund, LP ("Windmill") in West Texas Guar ("WTG"), a company in the business of purchasing and processing guar beans.[1] Complaint ("Compl.") ¶ 24. To acquire the guar beans needed for its business, WTG entered into a series of fixed-price contracts with various guar bean growers. *Id.* ¶ 30. In March 2014—by which point Windmill had acquired an 85 percent equity stake in WTG—the guar bean growers placed WTG into involuntary bankruptcy proceedings after it had failed to pay money due under the contracts for the 2013 crop. *Id.* ¶¶ 36–37, 39. Additionally, in August 2014, the growers filed five lawsuits against Scopia in Texas state court, all of which were eventually removed to the bankruptcy proceedings. *Id.* ¶¶ 52, 59.

Meanwhile, in February 2014, Scopia purchased insurance from St. Paul. *Id.* ¶ 13. After WTG was placed into bankruptcy, Scopia requested reimbursement for legal fees and costs incurred in connection with those proceedings. *Id.* ¶ 42. It soon became apparent that St. Paul and Scopia had different understandings of the scope of Scopia's insurance coverage. *See id.* ¶ 43. Although the parties continued to negotiate, *see id.* ¶¶ 49–50, they failed to resolve their differences, and on October 3, 2014, St. Paul, invoking the Court's diversity jurisdiction, filed the instant action requesting that the Court determine the respective rights of the parties under the insurance policy.

■ With that background, the Court now turns to Scopia's motions, beginning with the claim that subject matter jurisdiction is lacking. It is undisputed that defendants are citizens of New York and that St. Paul is a citizen of Connecticut, where it is incorporated. For purposes of diversity jurisdiction, however, a corporation is

a citizen not only of its state of incorporation, but also of the state of its "principal place of business," *see* 28 U.S.C. § 1332(c)(1), and the parties vigorously disagree about whether St. Paul's principal place of business is in New York or Connecticut. If, as Scopia contends, St. Paul's principal place of business is located in New York, then there is no diversity and the Court is without jurisdiction.

■ In *Hertz Corp. v. Friend,* the Supreme Court instructed lower courts to apply the "nerve center" test to determine where a corporation's principal place of business is located. *See* 559 U.S. 77, 80–81, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010). Under the nerve center test, the principal place of business is "where a corporation's officers direct, control, and coordinate the corporation's activities." *Id.* at 92–93, 130 S.Ct. 1181. The nerve center "is a single place," usually a corporation's headquarters and always the "actual center" of "direction, control, and coordination." *Id.* at 93, 130 S.Ct. 1181. Although the nerve center test is neither as clear-cut nor as simple to determine as the Supreme Court evidently intended, nonetheless, as subsequent courts have recognized, the test focuses on where a corporation's "high-level" decisions are made, not where day-to-day activities are managed. *See, e.g., Cent. W. Virginia Energy Co. v. Mountain State Carbon, LLC,* 636 F.3d 101, 106 (4th Cir.2011).

The evidentiary hearing before this Court established the following facts relevant to the jurisdictional analysis. St. Paul, along with approximately fifty other corporations, makes up the insurance business of The Travelers Companies, Inc. ("TRV"), a holding company and the parent company of this family of insurance

---

**1.** Powder from guar beans "is used to make products used by the food industry as well as in oil fracturing ('fracking') operations." Compl. ¶ 24.

subsidiaries. *See* Transcript of January 23, 2 015 Evidentiary Hearing ("1/23/15 Tr.") at 8:24–9:12. St. Paul, like its sister corporations, has no actual employees. *Id.* at 7:18–24. Instead, Travelers Indemnity Company ("TIC"), another TRV subsidiary, employs everyone who performs work on behalf of St. Paul, the other subsidiaries, and TRV itself. *Id.* at 7:18–24, 16:20–22. These employees operate TRV's insurance business, not on a company-by-company basis, but by line of business, of which there are three: (1) bond and specialty insurance, (2) business and international insurance, and (3) personal insurance. *See id.* at 8:24–9:12; Plaintiff's Supplemental Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 2.[2]

The TIC executives who oversee these lines of business also serve as officers of St. Paul and of "virtually all" of the insurance writing subsidiaries of TRV. *See id.* at 10:12–19. Nine of fifteen officers, as well as two other persons counted as "senior management personnel," work primarily or entirely in St. Paul's (and TIC's) offices at 1 Tower Square in Hartford, Connecticut. *See id.* at 12:3–13:4, 14:15–19. Brian MacLean, the Chief Executive Officer of these various subsidiaries and the head of the entire insurance business, has his primary office there.[3] *Id.* at 6:5–6, 20:7–8. Everyone involved in "underwriting and claim and all insurance operations" reports to Mr. MacLean. *Id.* at 20:4–8. Among the other members of the management team who work primarily in Hartford are Doreen Spadorcia, who oversees the personal insurance and bond and specialty

insurance lines of business, and Jay Steven Benet, who holds the title of Chief Financial Officer of St. Paul and is responsible for "accounting and finance functions within the company." *See id.* at 7:1–12, 11:6–22. In addition, decisions that "span the organization" are sometimes made by committees, including, among others, a Credit Committee and an Executive Risk Committee. *Id.* at 24:20–25:4. These two committees have approximately 12 members, and all but two of these members work in Hartford. *Id.* at 25:18–20.

In contrast, only three members of the fifteen-member management team operate primarily out of offices in New York City. *See id.* at 12:9–14. (In addition to the nine who are located in Hartford, the final three are located in St. Paul, Minnesota. *Id.*) One of those three, Chief Investment Officer William Heyman, is "ultimately in charge" of investing the premiums that St. Paul and the other subsidiaries collect. *Id.* at 34:18–20. But another, Alan Schnitzer, who is responsible for the third line of the insurance business, reports back to and works with Mr. MacLean, *id.* at 11:8–10, 33:22–34:1. The record contains no explanation of how the third officer in New York, Maria Olivo, fits into this puzzle, other than that she holds the title of Executive Vice President, Strategic Development & Treasurer. *See* Affidavit of Ann B. Mulcahy ¶ 4. It is clear, moreover, that no committees that wield any practical authority operate out of New York.

Perhaps defendant's strongest item of evidence is the fact that the Chief Executive Officer of TRV, Jay Fishman, sits in

---

**2.** During the evidentiary hearing, Brian MacLean, the Chief Executive Officer of St. Paul, agreed with Scopia's counsel that the three lines of business are (1) "[b]usiness insurance"; (2) "financial, professional, international insurance"; and (3) "personal insurance." 1/23/15 Tr. at 42:18–25. The

difference, if any, between this testimony and the above formulation is irrelevant for current purposes.

**3.** Mr. MacLean is also the Chief Operating Officer and President of TRV. 1/23/15 Tr. at 22:20–23.

New York. 1/23/15 Tr. at 18:12–13. As the head of the parent company, Mr. Fishman has the final say on all matters in which he participated and holds the power to hire and fire members of the management team. *See id.* at 49:5–7, 54:13–15. In actuality, however, Mr. Fishman's involvement in the affairs of St. Paul is quite limited. At the evidentiary hearing, Mr. MacLean testified that Mr. Fishman participated in the insurance companies' decisionmaking process only for exceptional matters, such as, for example, whether to acquire another company, *id.* at 31:2–3, whether to issue a new, "very risk type of insurance," *id.* at 30:5–8, and whether to "fundamentally change the risk profile of the insurance writing companies," *id.* at 31:5–7. Though Mr. Fishman also sits on two committees, specifically, the Management Committee and the Operations Committee, they are only informational and are not "decision-making bod[ies]."[4] *See id.* at 41:23–42:3.

Applying the nerve center test to these facts, the Court concludes that St. Paul's principal place of business is in Hartford, Connecticut and that St. Paul is, therefore, a citizen only of Connecticut (where, as mentioned, it is incorporated) and not of New York. The bulk of the direction, control, and coordination of St. Paul's activities occurs in Hartford, where Mr. MacLean, the head of the insurance business, and most of the management team are

located and where the large majority of the people who sit on the relevant committees work. While the nerve center test is not simply a numbers game, it does focus on where the "center" of direction, control, and coordination is located, *see Hertz,* 559 U.S. at 93, 130 S.Ct. 1181 ("The word 'principal' requires us to pick out the 'main, prominent' or 'leading' place."), and there is no indication that the small group of officers located in New York (or the small group in Minnesota, for that matter) exercises decisionmaking authority remotely comparable to that exercised in Connecticut. Moreover, St. Paul is, at its core, in the business of insurance, and the members of the management team responsible for directing the underwriting and claims aspects of St. Paul's operations are, with but one exception, located in Hartford. In this context, that the head of investments, Mr. Heyman, and one member of the insurance team, Mr. Schnitzer, sit in New York is not enough to convince the Court that St. Paul's principal place of business is in New York.

In arguing to the contrary, Scopia places undue emphasis on the fact that Mr. Fishman works out of New York. Scopia posits that, with his authority as the head of the parent company, Mr. Fishman acts as the overseer of St. Paul and the other subsidiaries, and Mr. MacLean merely implements his wishes as the manager of the day-to-day affairs of the insurance opera-

---

4. Scopia asserts that St. Paul's corporate representative testified at her deposition that these two committees do, in fact, make decisions that apply to the insurance companies. While such testimony would be binding on St. Paul if such testimony were given, a review of the portions of the deposition that Scopia cites reveals that the corporate representative stated only that these committees are made up of "senior leaders in the company that are looking across the operation." Declaration of Joseph Boury, Ex. 8, at 83:17–19. This is entirely consistent with the committees being

"informational bodies." For similar reasons, the Court finds Scopia's citations to statements that Mr. Fishman made during a quarterly earnings announcement largely irrelevant. *See* Movant's Post–Hearing Brief at 9–10. That Mr. Fishman is aware of how TRV's subsidiaries are run and can speak in some detail about their operations during an earnings call sheds little light on, and does not undermine Mr. MacLean's testimony regarding, the degree to which Mr. Fishman directs, controls, and coordinates those companies in the ordinary course.

tions.[5] *See* Movant's Post–Hearing Brief at 1. But the record, as just discussed, undermines Scopia's puppet-master theory. And, in light of this record, to find that St. Paul's principal place of business is tied to Mr. Fishman's location simply because he has ultimate but generally unexercised decisionmaking authority would disregard the Supreme Court's instruction to determine the "*actual* center" of direction, control, and coordination. *Hertz Corp.*, 559 U.S. at 93, 130 S.Ct. 1181 (emphasis added); *cf. also Evernu Tech., LLC v. Rohm & Haas Co.*, 10–cv–2635, 2010 WL 3419892, at *4 (E.D.Pa. Aug. 26, 2010) (rejecting the argument that the location of the corporate parent determines the "principal place of business" of a subsidiary when the latter's "officers [sought] approval from [the parent] for only 'exceptional' transactions ... such as acquiring a business or building a new plant"). Accordingly, the Court finds that it has jurisdiction in this case.[6]

▮ The Court now turns to Scopia's motion for abstention. "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995); *see also Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942). To guide courts in their determi-

nation of whether to abstain, the Second Circuit has "articulated a simple test that asks (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir.2003).

Here, both questions must be answered in the affirmative. First, the Court—or, depending on how the matter proceeds, a jury—will determine the scope of Scopia's insurance coverage and whether St. Paul has breached its obligations in failing to pay Scopia's claims for certain losses incurred in connection with WTG's bankruptcy. That will settle the legal issues that gave rise to this controversy. Second, there is no pending parallel state court action, as is often the case when courts abstain from hearing declaratory judgment actions, and so judgment in this case will finalize the controversy. Indeed, although this is a declaratory judgment action, if Scopia prevails the Court still has authority to award it damages. *See* 28 U.S.C. § 2202 ("Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."); *Beacon Const. Co. v. Matco Elec. Co.*, 521 F.2d 392, 400 (2d Cir.1975) ("It is well settled that 'further

---

5. Scopia also focuses on Mr. MacLean's statement that his leadership team oversees the "day-to-day operations" of the insurance companies. 1/23/15 Tr. at 31:23–25. While Scopia is correct that this does not itself support a finding that Mr. MacLean's team is part of St. Paul's nerve center, *see Cent. W. Virginia Energy Co.*, 636 F.3d at 106, Scopia errs to the extent it suggests that Mr. MacLean's comment undermines the Court's conclusion. Mr. Maclean also stated—and his testimony supported—that his team is in

charge of the "month-to-month operations" as well. *Id.* at 31:23–25.

6. As indicated in the Court's January 30, 2015 Order, this decision is without prejudice to Scopia's ability to raise additional arguments at summary judgment or trial if, during the course of discovery, it learns information that materially undermines the factual predicates of the Court's opinion.

relief [under § 2202] may include an award for damages.").

In an attempt to escape this conclusion, Scopia has theorized a second, as-yet-non-existent, lawsuit that it contends it will have to bring against TRV—which, as a citizen of New York, cannot be joined to this action—and that will thereby prevent the controversy from being resolved here. Scopia tells the Court that, in this potential action, it will assert claims that the adjuster with whom Scopia dealt made material misrepresentations and engaged in unfair settlement practices. *See* Declaration of Werner A. Powers, Ex. F, at 8. According to Scopia, TRV is the proper defendant because the adjuster, though an agent of St. Paul (and an employee of TIC), was held out as an agent of TRV. Since all of these supposed claims could be tried in a single state court action but the requirement of complete diversity prevents a single federal case, Scopia argues that the Court should abstain to avoid multiple lawsuits and potentially duplicative litigation.

The Court is unpersuaded. Scopia has failed to adequately explain why it must pursue these claims via the circuitous theory that the adjuster had apparent authority to act on TRV's behalf instead of bringing the claim directly against St. Paul, which actually handled the insurance policy and on whose behalf the adjustor actually acted. The proposed action, therefore, is a rather transparent theoretical concoction crafted to support a motion for abstention,[7] and the Court will not decline to exercise jurisdiction on this basis.

Scopia also contends that two secondary considerations support abstention. *See Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.*, 673 F.3d 84, 105 (2d Cir.2012) (noting, with approval, that "[o]ther circuits have added additional factors" to the abstention analysis). First, this is an insurance dispute, devoid of any questions of federal law, which, in Scopia's view, counsels that a state court is the more appropriate forum to adjudicate the matter. And second, there is some evidence in the record that St. Paul only initiated this litigation once it determined that Scopia was likely to file suit in a different jurisdiction, and thus, St. Paul, Scopia alleges, has engaged in forum shopping.

Neither of these arguments convinces the Court to change course. The Court places little stock in the fact that state law will govern this dispute. The very nature of the Court's diversity jurisdiction requires the Court to apply state law, and it

---

**7.** At oral argument, counsel for Scopia also suggested that Scopia has a theoretical cause of action against TRV for "operating as an insurer or an adjustor without a license in Texas." *See* January 7, 2015 Hearing at 37:22–24. The Court is equally skeptical of this claim. Even if Scopia was under the misimpression that it was dealing directly with TRV, St. Paul, which is licensed, issued the policy, and Scopia has demanded payment from St. Paul, not TRV. *See* Defendants' Memorandum of Law in Support of Defendants Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(B)(1) and *Wilton/Brillhart* Abstention at 6. It is unclear, therefore, what damages TRV could have caused, and a draft complaint that Scopia was permitted to file in connection with this motion fails to offer any insight on the matter. *Cf.* Tex. Ins.Code § 101.201(a) ("A person who in any manner assisted directly or indirectly in the procurement of the contract is liable to the insured for the full amount of a claim or loss under the terms of the contract *if the unauthorized insurer fails to pay the claim or loss.*") (emphasis added); *Guidry v. Envtl. Procedures, Inc.*, 388 S.W.3d 845, 858 (Tex.App.2012) ("In order to prove that [defendant's] failure to hold the proper licenses caused [plaintiffs] to receive a lower contribution ..., the Insureds had to produce evidence that they would have received more if their umbrella insurance had been purchased through a licensed agent.").

is capable of handling issues of state insurance or contract law when they arise. While in a close case, the law to be applied may tip the balance one way or another, this not such a case. Indeed, one of the issues here is whether New York or Texas law applies, an issue that can often best be decided by a federal court. As for the accusation that St. Paul is forum shopping, even if that were true, the Court fails to see why abstaining from this action to allow Scopia to pursue litigation in its preferred forum, *i.e.*, Texas, would be prudent. Scopia concedes that New York is as convenient of a forum as Texas for procuring evidence and securing the testimony of witnesses at trial, *see* Defendants' Memorandum of Law in Support of Defendants Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(B)(1) and *Wilton/Brillhart* Abstention at 10, and if, as St. Paul argues, New York law applies, then whatever expertise a Texas court may have in Texas law will not be brought to bear. In essence, to abstain here because St. Paul has allegedly forum shopped would simply switch out one forum shopper for another, except that the new one, Scopia, will be aided by the Court. The Court declines Scopia's invitation to play this role.

For the foregoing reasons, the Court reaffirms its denial of Scopia's motion to dismiss or, in the alternative, to abstain.